## Commonwealth *vs.* Elosko D. Brown.

No. 08-P-649.

Plymouth. January 15, 2009. - October 21, 2009.

Present: Rapoza, C.J., Duffly, & Cohen, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Threshold Police Inquiry. Search and Seizure,* Threshold police inquiry, Protective frisk, Reasonable suspicion.

A Superior Court judge erred in denying the criminal defendant's motion to suppress a firearm discovered during a patfrisk conducted after a police officer ordered the defendant to get out of a taxicab in which he was a passenger, where neither the nervous appearance of the defendant and a fellow passenger [530-536], their lack of documentary forms of identification [536-537], the fact that the officer stopped the taxicab in a high crime area [537-538], nor the number of passengers in the taxicab in relation to the number of police officers at the scene [538], either alone or in combination, justified the exit order or the patfrisk.

Indictments found and returned in the Superior Court Department on August 24, 2007.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Robert J. Cordy*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by him to the Appeals Court.

*Stephen Elliott* for the defendant.

*Christine M. Kiggen*, Assistant District Attorney, for the Commonwealth.

Duffly, J. The defendant was a passenger in a taxicab that was pulled over by a State trooper for a routine traffic violation. Because the defendant was not wearing a seat belt, the trooper asked for his license, which the defendant stated he did not have. Perceiving the defendant to be "nervous," the trooper

ordered the defendant to step out of the vehicle. During the ensuing patfrisk, the trooper found a firearm. A judge of the Superior Court denied the defendant's motion to suppress. A single justice of the Supreme Judicial Court granted the defendant's application for leave to pursue this interlocutory appeal. See Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). We reverse.

1. *Facts.* The judge's findings were based on the testimony of the sole witness, State Trooper Mark Cohen, which the judge explicitly credited. We summarize the findings and uncontradicted testimony. See *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337 (2007), *S.C.,* 450 Mass. 818 (2008). At approximately 8:40 P.M. on July 23, 2007, Trooper Cohen, while driving an unmarked police cruiser in Brockton, observed a taxicab heading south on Warren Avenue, then turning onto Nillson Street, a residential street. Noting that the taxicab was traveling too close to the left side of the two-way street, Cohen activated the cruiser's blue lights and signaled the driver to stop. The area was one that he patrolled more frequently than others "because of the inciden[ce] of crime." The trooper approached the driver's side of the taxicab. As he examined the driver's license and registration and questioned him about his driving,[1] he could see two passengers seated in the rear, looking straight ahead.

Noticing that the passengers were not wearing their seat belts, Cohen admonished them for failing to do so. In response, the passengers became agitated. According to Cohen, they had "tense, nervous looks on their face[s]" and "said that they were just [being driven] in a taxi." Cohen thought their responses "an overreaction" to the situation, and at that point decided "to get their information" in order to write each a citation for not wearing a seat belt. Cohen testified that when he asked the passenger seated behind the driver for a driver's license, the passenger responded that he "did not want to give [Cohen] a license." Cohen told the passenger that "he was in violation, he wasn't wearing a seat belt," and that he, Cohen, "needed to see a license." The passenger then informed Cohen that he did not have one. Cohen then requested, and the passenger provided, his name and

---

[1]The driver explained that he thought the taxicab's tending towards the left might be the result of an accident in which he had been involved earlier that day.

date of birth. Cohen then asked the second passenger, the defendant, for a driver's license or other identification. "In a quiet tone, he said no. He said he did not have a license or an ID on him."

As Cohen was questioning the passengers, a uniformed Brockton police officer, who happened to be patrolling the same street, stopped to inquire if Cohen was "all set." Cohen asked him to "stick around for a couple of minutes." The officer parked behind Cohen's cruiser and joined the trooper next to the driver's side of the taxicab.

At this point, according to Cohen, both passengers having stated that they did not have identification, he "just wanted to get some information from each party, separate them and talk with them and get some information." Cohen told the passenger seated behind the driver to step out of the vehicle, and he then pat frisked him "for safety." Finding no identification or anything else of consequence as a result of the patfrisk, he told the passenger to resume his seat in the taxicab.

Cohen and the officer then walked to the rear passenger side of the taxicab, where the defendant was seated, and told him to step out of the vehicle. On cross-examination, Cohen agreed that at this point he "had not seen either [passenger] make any sudden movements," nor had he "seen them make any furtive movements as if they were trying to bend over and hide something." Cohen testified, "At that point, I was going to pat frisk him for my safety and, same thing, I wanted to get some information from him just to write it down." The trooper pat frisked the defendant and discovered a revolver in defendant's pants pocket.[2]

2. *Discussion.* We are concerned once more with deciding whether a particular constellation of facts was constitutionally sufficient to justify the exit order and patfrisk of the defendant.[3]

We accept the motion judge's subsidiary findings of fact,

---

[2]The defendant was charged with carrying a firearm without a license, G. L. c. 269, § 10(*a*); having a prior conviction of a violent crime or serious drug offense, G. L. c. 269, § 10G(*a*); carrying a firearm with ammunition, G. L. c. 269, § 10(*n*); and possessing a firearm without a firearm identification card, G. L. c. 269, § 10(*h*).

[3]We will assume, without deciding, that the trooper could properly ask for the defendant's license in connection with the issuance of a citation for a seat belt violation and, after learning he had none, for his name and other identifying information. Cf. *Commonwealth* v. *Goewey*, 452 Mass. 399, 405-406

*Commonwealth* v. *Quinn*, 68 Mass. App. Ct. 476, 479 (2007), but "[t]he ultimate legal conclusion to be drawn from the fact[s] developed at the hearing [on a motion to suppress] is a matter for our review, particularly where the conclusion is of constitutional dimension." *Commonwealth* v. *Rivera*, 67 Mass. App. Ct. 362, 364 (2006), quoting from *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980).[4]

That an automobile stop may pose a danger to the officer involved is a fact beyond contention. See, e.g., *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999), *S.C.*, 432 Mass. 613 (2000), quoting from *Commonwealth* v. *Williams*, 46 Mass. App. Ct. 181, 183 (1999) ("[T]here is danger for a police officer inherent in any auto stop"). Accordingly, our courts have consistently held that "it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." *Ibid.* However, we do require that an officer have a basis for reasonable suspicion rooted in specific and articulable facts that a "particular passenger in the car is involved in criminal activity or 'engaged in other suspicious conduct.' " *Commonwealth* v. *Alvarez*, 44 Mass. App. Ct. 531, 534 (1998), quoting from *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997). See Grasso & McEvoy, Suppression Matters under Massachusetts Law § 5-3[c][1], at 5-7 (2009-2010 ed.), quoting from *Commonwealth* v. *Gutierrez*, 26 Mass. App. Ct. 42, 47 (1988) ("To justify the frisk, the officer must be able to point to 'particular facts' from which the inference is reasonable that the individual was armed and dangerous"). See also Grasso & McEvoy, *supra* at § 5-3[c][2], at 5-10. The facts offered here by the Commonwealth to justify the trooper's exit order and subsequent patfrisk of the defendant, while significant, do not establish such a basis.

(2008) ("In order to issue citations for the seat belt violations, [the officer] requested identification from each occupant [in the vehicle]"). See note 5, *infra.*

[4]The motion judge concluded that "the trooper had reason for his own safety and the safety of the public simply to ask the defendant to alight from the car and to provide some basic information so that a citation might issue. He could have returned to the cab and the matter might have closed. However, the response was unusual, inappropriate, the manner in which the agitation has been described for the Court suggest[s] that there was reasonable suspicion and that the patfrisk and recovery of the weapon and any ammunition was appropriate."

To justify an exit order or a patfrisk, "we ask 'whether a reasonably prudent [person] in the police [officer's] position would be warranted in the belief that the safety of the police or that of other persons was in danger.' " *Commonwealth* v. *Vazquez*, 426 Mass. 99, 103 (1997), quoting from *Commonwealth* v. *Santana*, 420 Mass. 205, 212-213 (1995). "A mere 'hunch' is not enough; rather the patfrisk must 'be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience.' " *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 662 (2001), quoting from *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974).

The Commonwealth argues that the exit order was justified by the following facts: the defendant and the other passenger appeared nervous; both lacked documentary forms of identification; the police were outnumbered; and the stop took place in a high crime area.[5] None of these observations in isolation is sufficient to justify an exit order, and they do not, in the circumstances here, combine to create that justification. See *Commonwealth* v. *Torres*, 424 Mass. at 161 ("Adding up eight innocuous observations — eight zeros — does not produce a sum of suspicion that justifies a line of interrogation, an order of persons out of their car, and a search of their car").

___

[5]The motion judge alluded to the possibility that the passengers may not have been required to wear seat belts. Cf. *United States* v. *Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (officer's good faith but mistaken belief that two license plates were required rendered stop unlawful); *Commonwealth* v. *Quezada*, 450 Mass. 1030 (2008) (officer's good-faith mistake as to scope of G. L. c. 111B, § 8, so-called protective custody statute, did not justify stop). Indeed, the applicable statute, G. L. c. 90, § 13A, inserted by St. 1993, c. 387, § 1, is directed to those riding in a "private passenger motor vehicle," and does not clearly apply to passengers in a taxicab. The statute specifically exempts those "involved in the operation of taxis":

"No person shall operate a private passenger motor vehicle or ride in a private passenger motor vehicle . . . unless such person is wearing a safety belt which is properly adjusted and fastened; provided, however, that this provision shall not apply to: . . .

"(e) anyone involved in the operation of taxis, liveries, tractors, trucks with gross weight of eighteen thousand pounds or over, buses, and passengers of authorized emergency vehicles."

Whether the citation properly issued was an issue not raised below, and we do not reach it in this appeal.

a. *Nervous appearance*. The trooper's testimony that the defendant and his fellow passenger had "nervous looks" or appeared to be "tense" are "general descriptions [that] fall short of the 'specific and articulable facts' which are required to demonstrate reasonableness. [*Commonwealth* v. *King*, 389 Mass. 233, 234 (1983)]." *Commonwealth* v. *Williams*, 46 Mass. App. Ct. 181, 184 (1999) (officer testified that defendant driver "was acting suspicious[ly], 'moving around' and appeared extremely 'nervous' "). See *Commonwealth* v. *Gonsalves*, 429 Mass. at 660, 669 (where trooper ordered passenger to leave taxicab because he "thought the defendant was extremely nervous. His hands were trembling and moving from his lap to the seat and back to his lap again, and he appeared to be breathing heavily," court concluded that "nervousness and fidgeting do not warrant what occurred here"). See also *Commonwealth* v. *DePeiza*, 449 Mass. 367, 372 (2007) (signs of nervousness "do not supply reasonable suspicion when considered in isolation"). It is thus well established that a defendant's nervous movements or appearance alone is insufficient to render a patfrisk reasonable.

Our appellate courts have considered a defendant's nervousness along with certain other factors in determining the reasonableness of an exit order or a patfrisk. Suppression is appropriately denied where, in addition to the defendant's nervous appearance, other factors exist, including in particular police observation of a furtive gesture. See, e.g., *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. 638, 640-641, 644 (2001) (after being told not to, defendant repeatedly got out of car, appeared nervous, and made furtive gesture); *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780, 781-783 (2005) (in high crime area defendant had "look of panic" and furtive movement while walking away from double parked vehicle into which his companion threw something); *Commonwealth* v. *Gomes*, 73 Mass. App. Ct. 857, 858 n.3 (2009) (officer approached car and "observed what appeared to be a bulletproof vest hanging on the rear of the defendant's seat. In addition, the defendant made furtive movements as the officer approached, he was nervous and sweating, and he refused to make eye contact"). See also *Commonwealth* v. *Calderon*, 43 Mass. App. Ct. 228, 229-230 (1997) (defendant's agitation during arrest of companion late at night in high crime area, coupled with good faith belief that defendant's lengthy rec-

ord included armed robbery arrest, supported reasonable belief that defendant might be armed and dangerous).

Nervous behavior in combination with the observation of a suspected weapon also has been held to justify police concern for safety. See, e.g., *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321-322 (2001) (defendant looked nervous and was sweating; officer saw weapons); *Commonwealth* v. *Rivera*, 67 Mass. App. Ct. at 363, 366-367 (driver's hands shook when asked to produce license; officer observed handle of police baton inside car).

Reasonable suspicion that a defendant is armed has been justified on evidence that the defendant was nervous and provided evasive or inconsistent answers regarding identification. See, e.g., *Commonwealth* v. *Feyenord*, 445 Mass. 72, 73-74 (2005), cert. denied, 546 U.S. 1187 (2006) (defendant driver appeared nervous and his hands were shaking; he did not produce valid driver's license, "did not provide an intelligible response to" officer's request for his name, and gave conflicting answers regarding his age); *Commonwealth* v. *Goewey*, 452 Mass. 399, 406-407 (2008) (defendant passenger provided expired license with photograph that did not resemble him in "several significant ways," appeared nervous, stammered when questioned about expired license, had hands that shook, and made furtive movements).

But nervous or anxious behavior in combination with factors that add nothing to the equation will not support a reasonable suspicion that an officer's safety may be compromised. In *Commonwealth* v. *King*, 389 Mass. at 245, but for an intervening action, the defendant's motion to suppress would have been allowed, despite the officer's testimony that the passengers' nervous behavior was "different from the ordinary because it made [the officer] feel nervous." *Id.* at 237.[6] The court discounted the additional factors that led the officer to be suspicious. According to the officer, his suspicions were aroused because one occupant of the parked vehicle was white and the other black; the vehicle was

---

[6]The officer in that case acknowledged that "it was not uncommon for people to become nervous when questioned by a uniformed State trooper." *Commonwealth* v. *King, supra.* As noted, *supra,* our decisional law reflects consistent and appropriate caution when too much reliance is placed on what a police officer perceives to be manifestations of nervousness or anxiety in the course of an encounter with a citizen.

parked in a rest area at 2 A.M.; the two men provided licenses from New York, whereas the vehicle had a Massachusetts registration and was not registered in either of their names; and "[t]he registration check yielded no response from the Registry of Motor Vehicles, which indicated either that the registration was new or no such plate was issued." *Id.* at 237 (footnote omitted). The court in that case observed that resting in a rest area is appropriate for travelers who were coming from New Hampshire, as the men stated they were. *Id.* at 243. Though the police were justified in seeking an explanation for the presence of the men and requesting their licenses and a registration, once the licenses had been verified and a "negative response to the 'missing and wanted' check supported the defendant's answers . . . , any justifiable investigation was ended." *Id.* at 244. See *Commonwealth* v. *Torres,* 424 Mass. at 155, 158-159 (court reversed denials of motion to suppress where suspicion was based on fact that defendant "seemed nervous" and defendant passenger's attempt, after having his back to approaching officer, to get out of vehicle without being asked).

In *Commonwealth* v. *Hooker,* 52 Mass. App. Ct. 683 (2001), as here, suspicion fastened on a passenger in a taxicab that had been pulled over for a routine traffic stop. The plain clothes officers in *Hooker* were in an unmarked vehicle in the Roxbury section of Boston, when they observed a taxicab abruptly swerve to the right, nearly hitting another vehicle. From his vantage behind the stopped taxicab, the officer saw the defendant, seated in the back seat, moving his shoulders up and down and repeatedly looking back. The defendant appeared nervous during questioning. The officer, who recognized the defendant as a man he had twice arrested, once for domestic violence and on another occasion in connection with a stolen motor vehicle, was concerned because the defendant had in the past been violent and acted in a threatening and verbally abusive manner towards him. *Id.* at 684. We noted that the violent behavior had occurred some years past and that the officer knew that the defendant had not been violent as he grew older. Our conclusion in that case applies equally here: "This was not a swiftly developing situation. . . . Besides the motor vehicle violation, the police observed no other illegal activity as they followed the taxi and nothing occurred in the course of the stop, either individually or in combination with

other facts, to create a reasonable suspicion that the defendant was engaging in criminal activity or posed a reasonable risk of harm to the officers or others." *Id.* at 686.

b. *Identification.* As noted, we will assume, without deciding, that Trooper Cohen could reasonably request the passengers to provide their driver's licenses in order to verify their identities so that he could issue citations. See notes 3 and 5, *supra.* The defendant's inability to provide a license was unremarkable — he was, after all, traveling by taxicab and therefore was not required to carry one. When asked, he provided his name and address, and there is no evidence that the information was false. Compare *Commonwealth* v. *Feyenord,* 445 Mass. at 73-74 (defendant driver produced no driver's license, "did not provide an intelligible response to" officer's request for his name, and gave conflicting answers regarding his age); *Commonwealth* v. *Goewey,* 452 Mass. at 407 (defendant passenger provided expired identification with questionable photograph); *Commonwealth* v. *Martin,* 73 Mass. App. Ct. 526, 528, 532-533 (2009) (defendant provided contradictory answers regarding age and date of birth).

Even if we assume that the exit order of the other passenger was justified on the basis that that passenger's statements were evasive or inconsistent,[7] and we do not decide that it was, the exit order issued to the defendant was not. As we have noted, "[t]he basis for the frisk must be particular to the individual." Grasso & McEvoy, Suppression Matters under Massachusetts Law § 5-3[c][2], at 5-10, citing *Commonwealth* v. *Vazquez,* 426 Mass. at 100-101. See *Commonwealth* v. *Ellsworth,* 41 Mass. App. Ct. 554, 556-557 (1996) (driver stopped for routine traffic

---

[7]The trooper testified that the passenger first told him he did not want to provide a license; then when the trooper said that it was needed to issue a citation, the passenger stated that he did not have a license or identification. Even assuming that the first exit order and the patfrisk of the other passenger were justified, a point we need not and do not resolve, the result of the frisk was consistent with what the other passenger had told the trooper, in particular that he did not have identification on his person. Thus, before the trooper ordered the defendant to step out of the vehicle, his initial concerns had been neither confirmed nor heightened. Indeed, some of the facts that may have initially supported a reasonable suspicion that the trooper's safety was in jeopardy — the agitated response to his admonition that the two passengers should wear their seat belts and the other passenger's inconsistency about whether he had identification — had been superseded by the time the defendant was ordered to step out of the taxicab.

violation produced valid license and registration; officer had no reason to issue exit orders to passengers despite earlier furtive movements of one passenger).

This was no " 'swiftly developing situation' that prevented verification or disproof of the officer's suspicions regarding the defendant's identity . . . through routine computer or radio checks." *Commonwealth* v. *Santos*, 65 Mass. App. Ct. 122, 126 (2005), quoting from *Commonwealth* v. *Sinforoso*, 434 Mass. at 325. See also *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 686 (2001). As in *Commonwealth* v. *Santos, supra*, there was no concern here about a possible stolen vehicle or other criminal activity. "Officers' actions must be 'no more intrusive than necessary at each step to effectuate both the safe conclusion to the traffic stop and the further investigation of the suspicious conduct.' " *Id.* at 126-127, quoting from *Commonwealth* v. *Torres*, 433 Mass. at 675.

c. *Character of the area.* "[T]hat these events occurred in proximity to a high crime area, by itself, [does not] operate to justify the exit order [to the defendant passenger from a taxicab]." *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 687. It is not by itself sufficient that the point of encounter with police occurs in a high crime area, although it may be "a relevant factor in determining whether there is reasonable suspicion of a threat to the officer's safety." *Commonwealth* v. *Holley*, 52 Mass. App. Ct. at 663 (because many law-abiding citizens who live and work in high crime areas "are entitled to the protections of the Federal and State Constitutions, . . . the fact that a routine traffic violation takes place in a high-crime area does not allow the police, without more, to order a driver out of a vehicle or to conduct a patfrisk"). See *Commonwealth* v. *Thompson*, 427 Mass. 729, 734, cert. denied, 525 U.S. 1008 (1998).[8]

The location of the encounter may be given inappropriate

[8]Cases in which a motion to suppress was denied based on factors that include the factor of a high-crime area involve additional factors not present here. See, e.g., *Commonwealth* v. *Almeida*, 373 Mass. 266, 271-272 (1977), *S.C.*, 381 Mass. 420 (1980) (inconsistent response, furtive movement, high crime area, at night); *Commonwealth* v. *Riche*, 50 Mass. App. Ct. 830, 831 (2001) (driver suddenly trying to exit car, driver's license suspended for drug offense, car registered in name of person not in vehicle, driver repeatedly asking if he was going to be arrested, high crime area, at night). See also *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. at 782-783.

weight where the encounter involves a passenger in a taxicab that is stopped by police. In the absence of any information regarding the passenger's nexus to the area, the passenger's presence in a taxicab that happens to be stopped in a high crime area suggests nothing sinister about the passenger. See Smith, Criminal Practice and Procedure § 3.59, at 138 (3d ed. 2007) (fact that place where police observed defendant was high crime area "is not significant where no suspicious activity of the defendant was observed by the police").

d. *Police outnumbered.* The Commonwealth also argues that because the trooper was alone when he first stopped the taxicab, he was outnumbered. The Brockton police officer arrived after both passengers had told Trooper Cohen that they did not have licenses. At the time that Cohen gave the exit order, there were two law enforcement officials and two passengers seated in the back of a taxicab. The officers were not outnumbered.[9] Compare *Commonwealth* v. *Moses,* 408 Mass. 136, 142 (1990) (officer outnumbered three to one when he asked the driver for his keys); *Commonwealth* v. *Feyenord,* 445 Mass. at 76 (officer outnumbered two to one); *Commonwealth* v. *Tompert,* 27 Mass. App. Ct. 804, 805-806, 809 (1989) (officer outnumbered two to one at time of exit order); *Commonwealth* v. *Kitchings,* 40 Mass. App. Ct. 591, 593, 596 (1996) (officer outnumbered four to one at time of exit order). In any case, whether police are outnumbered is not a basis, alone, to support reasonable suspicion. See, e.g., *Commonwealth* v. *Moses, supra* (furtive gesture, police outnumbered); *Commonwealth* v. *Tompert,* 27 Mass. App. Ct. at 809 (furtive movement, police outnumbered, at night).

*Conclusion.* The dangers that police officers face in automobile stops like the one that occurred here should not be taken lightly. Nonetheless, the exit order issued to the defendant in this case was based on a hunch and a desire to "get some information from each party, separate them and talk with them and get some information from them." "Although in hindsight [Trooper

---

[9]We also reject the Commonwealth's suggestion that the trooper was "outnumbered by three to one," because there is nothing in the evidence to suggest that the trooper regarded the driver as a potential threat to safety, or that the driver had any relationship to the passengers such that he could be expected to join them in any violent interaction with police.

Cohen's] hunch proved to be correct, we view the reasonableness of the search and seizure from the vantage preceding the discovery of the [firearm], and on that basis the actions of the police here exceeded constitutional grounds." *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 688. The order denying the motion to suppress is reversed.

*So ordered.*