Agnes, Peter W., J.
1. Introduction. The defendant is charged by indictment with Trafficking in Cocaine (28-100 grams) based on evidence seized by the Massachusetts State Police as a result of a motor vehicle stop for a civil motor vehicle infraction. The defendant has filed a pretrial motion to suppress. Based on the credible evidence presented at the hearing on the defendant’s pretrial motion to suppress, I make the following findings of fact and rulings of law.
2. Findings of fact. The Commonwealth’s case is based on the stop of a motor vehicle that took place on the westbound side of Route 2 in Lancaster, Mas *286 sachusetts on November 29, 2008 at 10:30 p.m. The stop resulted from the random selection by Trooper Eric Grace of the vehicle operated by the defendant for an electronic inquiry concerning the status of its inspection sticker. The trooper’s inquiry was made from a mobile data terminal in his marked state police cruiser. The trooper, who was following behind the defendant’s vehicle, learned that the vehicle had not been reported stolen, was registered, but that its inspection sticker had expired. Trooper Grace activated his lights and signaled the defendant to stop. The defendant, who was the sole occupant of the vehicle, slowed down and then stopped in the breakdown lane.
3. Trooper Grace approached the driver’s side door and asked the defendant to produce his license and registration. The defendant, who appeared nervous and who was breathing heavily, complied with the trooper’s request. Trooper Grace did not examine the vehicle to determine whether it actually had a valid inspection sticker affixed to the windshield. The defendant’s license was from the State of New Hampshire. Trooper Grace asked the defendant to whom the vehicle belonged and the defendant replied that it belonged to his friend “Jimmy.” At the time of this exchange, it was evident to Trooper Grace that the defendant was not completely fluent in English. I find that the conversation between the defendant and Trooper Grace as well as Trooper McCammon involved the defendant responding partly in English and partly in Spanish, and that some of the questions asked by the troopers had to be repeated. The defendant also said he was coming from Lawrence and headed toward Leominster. The conversation between the defendant and Trooper Grace was hampered by the fact that English was not the defendant’s first language and some of what he said in Spanish could not be understood by Trooper Grace.[1] The defendant could not give a last name for the vehicle’s owner. Trooper Grace also smelled a strong odor of a car freshener which made his suspicious because he had been trained that such items are sometimes used to mask the odor of drugs. When asked where he was going, the defendant replied to Exit 23 (at the time they were in the vicinity of exit 32, 33 or 34).[2]
4. Trooper Grace returned to his cruiser, did a license and registration check using his mobile data terminal, and learned that the vehicle was registered to a female in Lawrence with a last name of “Lopez.” At this point, State Police Trooper McCammon, arrived on the scene. He happened to be driving past the location and stopped to see if he could be of assistance to a fellow trooper. Trooper McCammon conferred with Trooper Grace and decided to make inquiiy of the defendant. Trooper McCammon asked the defendant who owned the vehicle. The defendant was not able to communicate the name of the vehicle’s owner to Trooper McCammon in a way in which Trooper McC-ammon was able to understand.[3] Trooper McCammon also asked the defendant if he had any weapons. The defendant answered “no.” Trooper McCammon asked the defendant if he would step outside the vehicle. The defendant said “yes,” and then exited his car. He was pat frisked. The police removed a wad of United States currency in the amount of $420.00. Trooper McC-ammon next asked the defendant if he would agree to let the police search the vehicle. This question was asked multiple times. The defendant replied “yes.”
5. The defendant was placed inside Trooper Grace’s police cruiser while Trooper Grace and Trooper McC-ammon inspected the interior of the defendant’s vehicle. The officers first did a visual inspection from the outside and then entered the vehicle. A sweep of the area around the driver’s seat did not reveal any weapons, but the troopers did notice that a face plate on the dashboard was a slightly different color from the rest of the dashboard and didn’t seem to fit on the dashboard correctly. See exhibits 1-7 (photographs of the vehicle’s interior). Eventually, based on an examination of the dashboard and the discoveiy of electrical wires that appeared out of place, the state police troopers discovered a “hide” underneath the dashboard containing plastic bags filled with a white substance that turned out to be cocaine, a Class B controlled substance. The defendant was placed under arrest and transported from the scene.
6. Discussion. The State Police were entitled to stop the defendant’s vehicle for the purpose of issuing him a citation for a motor vehicle infraction such as an expired, invalid or missing inspection sticker. See Commonwealth v. Bacon, 381 Mass. 642, 644 (1980). The mere fact that a police officer who is carrying out a routine standard police practice of enforcing the traffic laws and the laws pertaining to motor vehicle equipment suspects or has a hunch that the operator or passengers are involved in illegal drug activity does not invalidate the stop so long as there was a valid basis for it based on an objective assessment of the facts and circumstances. See Commonwealth v. Santana, 420 Mass. 205, 208 (1995).[4] The information supplied by the defendant did not fit with the facts. First, the defendant stated he was going to exit 23, but, as Trooper Grace testified, the correct exit for Leominster off of Route 2 would be exit 32, 33, or 34. Also, the defendant identified the vehicle’s owner as “Jimmy,” when in fact it was a female whose last name is Lopez. On the other hand, it is significant that the defendant’s ability to speak English was limited and even the troopers admitted it was hard to understand some of his answers.
7. Basis for an exit order. The first question that arises in this case is whether the troopers were justified in asking the defendant to step outside his vehicle. Whether in the form of an express directive or a request, the police must have justification before a motorist is required to exit from his or her vehicle during a traffic stop. See Commonwealth v. Rivera, 67 *287 Mass.App.Ct. 362, 365 (2006). Under Article 14 of the Declaration of Rights, automatic exit orders in connection with routine traffic stops are prohibited. Commonwealth v. Gonsalves, 429 Mass. 658, 661-62 (1999). Instead, Massachusetts law requires the police to have a reasonable suspicion of danger to themselves or others based on an objective assessment of the circumstances. Id. at 665, 667. It was the testimony of the two troopers in this case that the exit order was administered for their safety and protection, and not as an investigatory measure. Indeed, an exit order could not have been issued as an aid to the investigation of criminal activity because there was no evidence at the time the order was issued that a crime had been, was being or was about to be committed. See Commonwealth v. Santos, 65 Mass.App.Ct. 122, 125 (2005). Although the Supreme Judicial Court has observed that it does not take much for a police officer to establish a basis for an exit order that will be regarded by the court as reasonable, see Gonsalves, 429 Mass. at 664, a hunch is not enough. Id.
8. At the time of the exit order, the defendant had a valid license, the vehicle was not stolen and was properly registered. The police did not observe any gestures or movements by the defendant that were unusual or threatening. The defendant’s nervousness in the circumstances of a motor vehicle stop for a minor infraction like an expired inspection sticker that does not involve any evidence of furtive gestures, evasive answers, or what appears to be a weapon does not constitute a “specific and articulable fact” that adds any weight to the calculation of reasonable suspicion. See Commonwealth v. Brown, 75 Mass.App.Ct. 528, 533-35 (2009), and cases cited. Contrast, Commonwealth v. Goewey, 69 Mass.App.Ct. 429, 435 (2007) (nervous behavior coupled with furtive gestures and movements). The only facts that could be described as suspicious include the following: (1) the defendant did not correctly identify the registered owner, (2) the defendant incorrectly identified the exit number for Leominster which was the destination he gave and (3) there was a strong odor of an air freshener coming from inside the vehicle. These are not the types of facts, taken singularly or in combination, which establish a reasonable basis for an exit order and a pat frisk. See Commonwealth v. Torres, 424 Mass. 153, 161 (1997); Commonwealth v. Brown, supra, 75 Mass.App.Ct. at 532; Commonwealth v. Nutile, 31 Mass.App.Ct. 614, 618 (1991); Commonwealth v. Wooden, 13 Mass.App.Ct. 417, 419-20 (1982). This is not a case where a combination of factors, each innocent in themselves, amount to a reasonable suspicion that the defendant was armed and dangerous. Contrast, Commonwealth v. Martin, 73 Mass.App.Ct. 526, 533-34 (2009), and cases cited. The fact that the police encounter a person in circumstances in which they have reasonable grounds to believe a crime or a civil motor vehicle infraction has occurred does not necessarily justify an exit order and/or a pat frisk. See Commonwealth v. Gomes, 453 Mass. 506, 512-14 (2009).
9. The conduct of the police during motor vehicle stops for minor infractions of the law is governed by the principle of objectivily and the doctrine of proportionaliiy. See Commonwealth v. Silva, 366 Mass. 402, 405 (1974). Objectivity means that the police cannot act on the basis of a hunch or mere suspicion, but are limited to actions based on objectively verifiable facts that support an inference that criminal activity is underway or that the driver or a passenger is armed and dangerous. See Commonwealth v. Santos, 65 Mass.App.Ct. at 126-27. See also Commonwealth v. King, 389 Mass. 233, 243 (1983) (“Amere hunch or ‘a gut feeling that there was something definitely wrong’ on the part of the officer is insufficient to satisfy the requirement of specific and articulable facts”). Proportionality means that any investigative steps taken by the police must be “no more intrusive than necessary at each step to effectuate both the safe conclusion to the traffic stop and the further investigation of the suspicious conduct.” Commonwealth v. Torres, 433 Mass. 669, 675 (2001). If a person who was operating a motor vehicle without a license in his possession or a registration and who was stopped by the police when his vehicle ran a red light and cut off another vehicle in a high crime area could not be ordered out of his car to enable the police to continue their investigation, see Commonwealth v. Santos, supra, then the troopers lacked the right to issue an exit order to the defendant in this case.
10. Validity of consent. In cases in which the Commonwealth relies on consent as the justification for a warrantless search, there are at least two distinct questions which must be addressed: First, did the individual actually consent; second, was the consent given “freely and voluntarily.” See Commonwealth v. Rogers, 444 Mass. 234, 238-39 (2005). Even assuming that the defendant gave his consent to a search of the vehicle, the Commonwealth has not established by a preponderance of the evidence that the consent given by the defendant was voluntary. See Commonwealth v. Harmond, 376 Mass. 557, 561-62 (1978). The burden of proving that the defendant acted freely and voluntarily in giving consent rests on the Commonwealth. See Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995), quoting Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968). The fact that the defendant’s response to the request to search the vehicle was “yes” does not obviate the need to determine voluntariness. See Commonwealth v. Brown, 32 Mass.App.Ct. 649, 652 (1992).
11. In the circumstances of this case, I find that the defendant’s response was a mere acquiescence to a claim of lawful authority. See Rogers, 444 Mass. at 241. The defendant, who does not speak fluent English, found himself alone with two uniformed state police officers who had manifested their suspicion by *288 asking him a series of questions that were unrelated to the purpose for the stop of his vehicle. The defendant was in a position in which he could not leave without permission from the troopers because they had taken his license and registration. The police did not explain that the defendant had a right to refuse consent and that he was free to leave the scene if he chose not to give his consent. The police did not explain what type of search they had in mind and, due to the language differences, it is not clear what the defendant’s understanding was of the request by the police for permission to search. And, the police did not use a written form to advise the defendant of his rights and to memorialize his consent. This is not a case in which the defendant’s age, education or experience with law enforcement reinforces the Commonwealth’s claim. Contrast, Commonwealth v. Perrot, 407 Mass. 539, 543 (1990). Here, unlike so many other cases in which voluntary consent was found to have been given, there are no indicia of voluntariness beyond the simple answer “yes.” See Rogers, 444 Mass. at 242-44, and cases cited. In this case, I conclude that the Commonwealth has not sustained its burden of proof that any consent given by the defendant was voluntary. See Commonwealth v. Heath, 12 Mass.App.Ct. 677, 685 (1981).
ORDER
In cases involving a warrantless search in which the Commonwealth relies on the doctrine of consent, the law assigns responsibility to the trial judge to both assess the credibility of the witnesses and to determine the weight of the evidence. Commonwealth v. Murphy, 362 Mass. 542, 547 (1972). Here, the Commonwealth has failed to establish that the State Police troopers, who detained the defendant after stopping his vehicle for an inspection sticker violation, had a legitimate basis to fear for their safety and thus to issue an exit order and to conduct a pat frisk. Moreover, even apart from this question, the Commonwealth has not sustained its burden of proving voluntary consent.
This court is mindful of the dangers to the police associated with motor vehicle stops, especially when a trooper is outnumbered by several occupants and in a remote location. But it is important for law enforcement officials to be mindful of the “widespread public concerns” about motor vehicle stops based on racial or ethnic appearance. See Commonwealth v. Lora, 451 Mass. 425, 444-45 (2008), and cases cited.
The issue is not whether the defendant had a quantity of drugs hidden in his vehicle. Even if it is assumed that the defendant knew about the secret “hide” and that it contained drugs, the defendant was entitled to the same protection of the law as everyone else when his vehicle was pulled over for an invalid inspection sticker and the subsequent events did not give rise to a reasonable belief that he was armed and dangerous or otherwise engaged in criminal activity. For the above reasons, the defendant’s motion to suppress is ALLOWED.

 During the hearing in this case, the defendant was assisted by a Spanish speaking interpreter.

 The court takes judicial notice that the exit numbers on Route 2 increase as one travels west to east. Thus, a vehicle traveling in the westbound lane in Lancaster would be heading toward Leominster which is a short distance away and served by exits 30-33. The court also takes judicial notice that exit 23 serves the city of Gardner which is west of Leominster.

 There was testimony that the defendant told Trooper McCammon that his destination was Lawrence, not Fitch-burg. It’s not clear whether this difference was attributable to the language barrier between the troopers and the defendant. In any case, I do not credit the testimony that the defendant gave two different destinations to the police.

 The court is mindful that in Commonwealth v. Santana, 420 Mass. 205 (1995), the Supreme Judicial Court specifically eschewed the “reasonable police officer” test to determine whether a motor vehicle stop is pretextual and adopted the so-called “authorization” test which turns on whether the police “are doing no more than they are legally permitted and objectively authorized to do.” Id. at 209 (quotation omitted). However, in Santana, the Court went on to note that the motor vehicle stop in that case was a matter of routine standard police procedure. There was no evidence presented in this case whether Trooper Grace’s method of selecting vehicles at random for inspection sticker inquiries was a matter of routine standard police procedure. In Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999), the Court acknowledged that “(r)outine traffic stops may also pose unique hardships on minorities who, it has been argued, are often the subject of stops on pretext.”