SUPERIOR COURT 
 
 COMMONWEALTH VS. GREG ALTENOR

 
 Docket:
 19-593
 
 
 Dates:
 November 4, 2020
 
 
 Present:
 /s/Peter B. Krupp Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 FINDINGS AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS
 
 

             On July 12, 2019, the police stopped Greg Altenor's vehicle for a civil motor vehicle infraction, ordered him out of the vehicle, and located a firearm and ammunition in the glove compartment. Now charged with unlawful possession of the firearm and ammunition, defendant moves to suppress the fruits of the exit order and search of the vehicle. After an evidentiary hearing at which the Commonwealth called two witnesses, the motion is allowed.
FINDINGS OF FACT
            Based on the preponderance of the credible evidence, I find the following facts:
            On July 12, 2019, Boston Police Officer Omar McGovern was working as a patrol officer in a marked cruiser with his partner, Officer Murphy. Both officers were in full uniform on patrol in the vicinity of Chinatown. At approximately 7:40 p.m., they observed a black Infiniti sedan (Mass. Reg. 9XY983) ("the Vehicle") idling next to a fire hydrant on Beach Street near the intersection with Washington Street.[1] They observed the Vehicle to have excessive window tint.
---------------------------
[1]This area of Boston is between Chinatown and the Theater District, with a number of residential and commercial buildings, restaurants, and stores. It is also an area where the police have made a number of arrests for drug distribution. See Ex. 2 (reflecting arrests for hand-to-hand drug sales on January 22, 2019, February 10, 2019, and May 22, 2019, within a few blocks of the corner of Beach and Washington Streets). Each police report in Exhibit 2 contains a similar sentence to the effect that the police have made hundreds of arrests in this area resulting in the seizure of illegal narcotics and criminal convictions. The police reports do not state when these other arrests were made or define the scope of the relevant area.
                                                            -1-
Off. McGovern saw the silhouette of two people in the Vehicle. Off. McGovern pulled his cruiser around the corner onto Washington Street to observe the Vehicle.
            The police did not observe any suspicious activity. They did not see anyone approach the Vehicle, enter or exit the Vehicle, or interact with anyone in the Vehicle. After a minute or two, the Vehicle turned onto Washington Street. After the Vehicle passed them, Officers McGovern and Murphy followed in their cruiser. The Vehicle then took a right onto Essex Street, which has three marked lanes. The Vehicle was initially in the left lane. The Vehicle sped up over the short distance between Washington Street and Harrison Street, but was not speeding, and crossed from the left lane, across the center lane, and into the right lane. The Vehicle did so without signaling the lane changes. The Vehicle stopped properly in the right lane at the red traffic signal. Off. McGovern's cruiser was in the center lane about 20 feet behind the Vehicle. Off. McGovern observed the driver's window to be down and saw the driver, later identified as defendant, looking in his rear view mirror in the direction of the police cruiser. This action was consistent with a person who had just changed lanes without signaling and who is aware that police officers in a marked police vehicle were behind him and likely saw his lane-changing maneuver.
            Off. McGovern activated his cruiser lights to signal a motor vehicle stop. As a result, the Vehicle remained stationary — it did not proceed through the light. The cruiser pulled behind the Vehicle. Off. McGovern observed defendant reaching over towards the passenger side of the car before he (Off. McGovern) exited his cruiser. When Off. McGovern exited his police cruiser, he approached the driver's window. Off. McGovern smelled alcohol and marijuana. Off. McGovern
 
                                                            -2-
 
did not inquire about those smells, and did not identify those smells as emanating from the defendant.[2]
            Off. McGovern told defendant that he had stopped him because his windows had excessive tint. Defendant disagreed that the windows were excessively tinted. Off. McGovern asked defendant for his license and registration. Defendant provided his license and asked again why he had been stopped. This time, Off. McGovern said it was because of excessive tint and because of a marked lane violation.[3] Defendant then reached over to the glove compartment, opened it without having to unlock it, took out the registration, closed the glove compartment, and handed the registration to Off. McGovern. When defendant opened the glove compartment, Off. McGovern saw there was a gray fanny pack inside under the registration. This was the extent of Off. McGovern's interaction with defendant before issuing the exit order.[4] At no time did defendant speak loudly, aggressively or belligerently.
            With defendant's license and registration, Off. McGovern returned to his cruiser and called for backup. Off. McGovern determined defendant's license and registration were valid. He
---------------------------
[2]The smell of burnt marijuana is not a basis for reasonable suspicion of a civil marijuana infraction. Commonwealth v. Rodriguez, 472 Mass. 767, 778 (2015).
[3]Both excessive tint and marked lane violations are civil infractions. See G.L. c. 90, § 9D (window tint violation punishable by fine up to $250); G.L. c. 89, §§ 4A, 5 (marked lane violation punishable by fine up to $100).
[4]Off. McGovern testified that, although defendant was seated in an air conditioned car, he (defendant) was breathing hard, with his chest going up and down; and was sweating, with beads of sweat accumulating on his forehead. I do not credit this testimony. The video evidence, see, infra, at 4, which begins shortly before the exit order and only a minute or two after the stop, is inconsistent with Off. McGovern's stated observations. The video depicts defendant sitting calmly, although clearly annoyed about being stopped; but without sweating or heavy breathing. Defendant does not appear nervous. In addition, the type of autonomic stress response that Off. McGovern described, with its physical manifestation of anxiety, is not the type of physiologic reaction that can simply be wiped away like beads of sweat from one's forehead, as Off. McGovern hypothesized.
                                                            -3-
also ran defendant's name through the Criminal Justice Information Services ("CJIS") database, learning that defendant had an open firearm case and had been charged in prior drug cases. Two other officers arrived quickly, bringing to at least four the number of officers on hand when Off. McGovern issued the exit order. Off. McGovern was only in his cruiser for about a minute before he exited his cruiser, approached the driver's side of the Vehicle, and said to defendant: "Do me a favor, man, step out of the vehicle. Anything inside this vehicle I should be concerned about?" In response, defendant asked: "What am I stepping out of the vehicle for?" Off. McGovern responded: "Do me a favor, step out." As defendant reached for his cellular phone, which (unbeknownst to the police officers) was recording, defendant calmly asked Off. McGovern "What's going on, sir?" Off. McGovern says: "I just told you right now. You have anything inside this vehicle I should be concerned about?" Defendant asks again: "What is the problem?" Det. McGovern says: "I just told you, man, based on your history, the way you are acting right now and everything . .." When defendant interjects the question: "How am I acting," Off. McGovern did not respond.
            Defendant then got out of the Vehicle and was moved to the back of the Vehicle. The police pat frisked defendant (finding nothing), searched the Vehicle, found the glove compartment locked, retrieved the key to open the glove compartment from defendant, opened the glove compartment, and found a firearm inside the fanny pack in the glove compartment.
DISCUSSION
            Defendant does not challenge the warrantless stop of the Vehicle. As defendant acknowledges, the police may stop a motor vehicle for a civil motor vehicle infraction, see Commonwealth v. Cordero, 477 Mass. 237, 242 (2017) ("trooper was authorized to stop the defendant for civil traffic infractions"); Commonwealth v. Amado, 474 Mass. 147, 151 (2016)
                                                            -4-
(police authorized to stop car with an unlit license plate); Commonwealth v. Santana, 420 Mass. 205, 207 (1995) (police authorized to stop vehicle for broken taillight), even if the civil infraction gives cover to other, non-discriminatory motives for the stop. See Commonwealth v. Larose, 483 Mass. 323, 327 (2019) ("We have applied this test, often referred to as the authorization test, without regard for the gravity or magnitude of the perceived violation."); Commonwealth v. Buckley, 478 Mass. 861, 865-866 (2018) (speeding and driving with defective headlights sufficient basis to stop suspected drug dealer); Commonwealth v. Avellar, 70 Mass. App. Ct. 608, 613 (2007) (officer's motivation irrelevant if officer has reasonable suspicion driver violated traffic law). See also Commonwealth v. Long, 485 Mass. 711, 718 (2020) ("police may not target drivers for traffic stops, citations, and further investigation because of their race").[5]
            Once a valid traffic stop occurs, the scope of the stop is limited to the reason for the stop unless other developments during the stop justify greater intrusion. The reason for the stop in this instance was to enforce the civil motor vehicle laws. On the information known to the police at the time of the stop, the police had the right to stop the Vehicle to give the operator a citation.
            "[I]ssuing an order to a motorist to get out of his or her vehicle during a traffic stop is an imposition that cannot be considered minimal." Commonwealth v. Torres-Pagan, 484 Mass. 34, 39 (2020). Although federal law permits "automobile exit orders to be issued during any traffic stop," the Supreme Judicial Court has rejected the federal rule, recognizing that "unfettered discretion" to issue exit orders is "a clear invitation" to issue them in a discriminatory manner. Long, 485 Mass. at 744 (Gants, C.J., concurring), quoting Commonwealth v. Gonsalves, 429
---------------------------
[5]Defendant, who appears to be African-American, does not argue that race was a factor in Off. McGovern's decisions to stop the Vehicle for the civil motor vehicle infraction or to issue the exit order.
                                                            -5-
Mass. 658, 664 (1999). See Gonsalves, 429 Mass. at 664 ("to permit an officer, in the absence of any specific and articulable facts, to order the driver of a vehicle ... to step out of the vehicle would be to invite random and unequal treatment of motorists"). The SJC has thus limited law enforcement's discretion to issue exit orders to situations "where (1) police are warranted in the belief that the safety of the other officers or others is threatened; (2) police have reasonable suspicion of criminal activity; or (3) police are conducting a search of the vehicle on other grounds." Torres-Pagan, 484 Mass. at 38.
            The Commonwealth relies on the first of these three grounds. It argues the police ordered defendant out of the Vehicle because of an objectively reasonable fear for their safety.[6] To evaluate this reason for the exit order, the court must consider whether "a reasonably prudent man in the policeman's position" would have been "warranted in the belief' that his safety or the safety of others was in danger. Amado, 474 Mass. at 152, quoting Commonwealth v. Cruz, 459 Mass. 459, 466 (2011). "Although 'it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns,'" Commonwealth v. Barreto, 483 Mass. 716, 723 (2019), quoting Gonsalves, 429 Mass. at 664, the officer's concern must be "objectively reasonable and 'grounded in specific, articulable facts and reasonable inferences [drawn] therefrom rather than on a hunch.'" Commonwealth v. Bryan, 98 Mass. App. Ct. 238, 243 (2020), quoting Commonwealth v. Meneus, 476 Mass. 231, 235 (2017). "[J]ustification for an exit order does not depend on the presence of an 'immediate threat' .. . , but rather on the safety concerns raised by the entire circumstances of the encounter." Commonwealth v. Hernandez, 77 Mass. App. Ct. 259, 269 (2010), quoting Commonwealth v. Stampley, 437 Mass. 323, 328 (2002). Although the standard is objective, an officer's subjective
---------------------------
[6]The police did not have a reasonable suspicion that defendant had committed or was committing any crime, nor did they have any basis to search the Vehicle.
                                                            -6-
reaction may nonetheless be instructive in deciding whether the circumstances created an objectively reasonable safety concern. See Commonwealth v. Daniel, 464 Mass. 746, 753 n.2 (2013) ("It is not necessary to show that an individual police officer personally experienced fear, so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger, but an officer's actions may suggest whether a suspect's movements appeared threatening to a trained eye.") (citation and internal quotations omitted).
            Off. McGovern amassed a number of justifications for the exit order: the location where he had observed the Vehicle was an area where drug deals had been observed in the past; the Vehicle was observed after 6 p.m.; defendant was evasive in answering questions; defendant's behavior was suspicious; and defendant had a criminal history. As described below, these factors, viewed collectively, gave rise to a hunch that defendant might be armed, but not a good faith, reasonable fear that defendant was armed and posed a risk to the police.
            The location of the initial observation of the Vehicle was in a busy commercial and residential area, near Chinatown, the Theater District, restaurants and shopping. The fact that the police have also seen street-level drug distribution in the area does not give rise to a reasonable basis to believe that the individuals in the Vehicle were engaged in drug distribution. Commonwealth v. Brown, 75 Mass. App. Ct. 528, 537 (2009) (encounter in high crime area not sufficient to establish threat to officer safety). If this were true, every vehicle that pulled over for a minute or two in the area could be subject to an exit order. See Commonwealth v. Evelyn, 485 Mass. 691, 709 (2020) ("The characterization of an area as 'high crime' cannot justify the diminution of the civil rights of its occupants."). The police saw no interaction between the individuals in the Vehicle and anyone else, and observed no furtive actions or activity consistent with drug distribution. The police had no information that defendant (or his passenger) were
                                                            -7-
engaged in drug distribution. The police did not even cite the driver for idling in front of a fire hydrant. Moreover, the nature of the area had no "direct connection" to the civil motor vehicle infraction being investigated. Id., quoting Tones-Pagan, 484 Mass. at 41 (2020).
            More importantly, the police did not have information that this was an area known for unlawful firearm possession or gun violence. While there may be a generalized correlation between drug distribution and firearm possession, the police established that the area where the police initially observed the Vehicle was principally know for street-level drug distribution, see, supra, at 1 n.1, which may not carry the same risk of firearm possession.
            The time of day, about 7:40 p.m., also does not give rise to a reasonable belief that defendant was armed and dangerous. It was a summer evening. It was still daylight. The mere presence of the Vehicle at 7:40 p.m. does not give rise to a reasonable suspicion that the driver is armed and dangerous. Even if there is more drug dealing in the area in the evening, the mere fact that the defendant was driving a car in the area at 7:40 p.m. and stopped briefly (without interacting with anyone outside the Vehicle) is innocuous.
            During the stop, defendant was not evasive. There was nothing evasive about defendant disagreeing with Off. McGovern about whether the Vehicle had excessive tint. Nor was there anything evasive about defendant asking why he had been stopped, which Off. McGovern characterized as evasive. Defendant did not refuse to answer any questions, did not provide any false information, and did not say anything to suggest that he posed a danger to the officers. Even if defendant had been nervous or evasive, it would not have been surprising, and in any event, as the Supreme Judicial Court has recently advised, such a reaction should be "significantly discount[ed]" in the calculus. Evelyn, 485 Mass. at 708-709. See Commonwealth v. Torres, 433 Mass. 669, 673 (2001) ("nervousness or fidgeting" by driver or passengers in a
                                                            -8-
stopped vehicle not adequate to justify exit order); Bryan, 98 Mass. App. Ct. at 244 (nervousness alone cannot justify exit order); Commonwealth v. Brown, 75 Mass. App. Ct. 528, 533-534 (2009) ("nervous or anxious behavior in combination with factors that add nothing to the equation will not support a reasonable suspicion that an officer's safety may be compromised").
            Although Off. McGovern testified that he was concerned that defendant reached toward the passenger side inside the Vehicle before Off. McGovern first approached, I do not find this testimony credible or that defendant's conduct in this regard raised an objective safety concern. Off. McGovern admitted that he has seen many people reach toward the passenger side after they have been stopped, and conceded that he assumed in this instance that defendant had reached over to get his license. Accord United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005) ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood."). There was nothing furtive about defendant reaching toward the passenger side. Defendant did not duck out of view, move quickly or secretively, or bend over to reach under his or the front passenger's seat. Cf. Stampley, 437 Mass. at 327 (and cases cited) ("gestures suggestive of the occupant's retrieving or concealing an object raise legitimate safety concerns to an officer conducting a traffic stop"). Nor did Off. McGovern even see fit to ask defendant why he reached in that direction.
            Finally, Off. McGovern indicated he based his exit order on defendant's prior criminal history, including cases for drugs and an open firearm case. This is the crux of the issue. Off. McGovern did not inform the court how old defendant's prior drug cases were, but the firearm case was pending. Defendant's criminal history was the animating reason for the exit order. It was not, however, without more — and there was nothing more — the basis for a well-founded
                                                            -9-
reasonable belief that defendant was armed and posed a risk to officer safety. Indeed, at this point, the only thing the officers needed to do was to issue a citation to the driver for the motor vehicle infractions.
            Instead, defendant's criminal history was the reason the police decided to conduct a further investigatory exit order, so as to be able to pat frisk defendant and do a cursory search of the Vehicle. This was in violation of defendant's rights because the police lacked reasonable suspicion to justify the search. To be sure, a person's criminal record may be one of many factors supporting a well-founded belief that a person stopped for a motor vehicle infraction is armed and dangerous. In the cases the Court has been able to find, however, a defendant's prior criminal record was one factor among others supporting a well-founded fear for officer safety. See, e.g., Amado, 474 Mass. at 152 (exit order justified by safety concerns where defendant was stopped in a high-crime area, moved arms behind his back and then brought them forward as officers approached, did not make eye contact with officer, was breathing rapidly, and was recently arrested "for being in an automobile with an unlawful firearm"); Commonwealth  v. Douglas, 472 Mass. 439, 446-447 (2015) (exit order justified where officer knew defendant had prior firearm conviction and defendant expressed displeasure he was stopped, exited his vehicle before he was asked, and put his car in "drive" when he returned to his seat); Bryan, 98 Mass. App. Ct. at 243 (officer had objectively reasonable concern for safety where officers stopped vehicle in area known for gun violence, one passenger had prior firearm conviction, all passengers were acting nervous, and officers had received tip that a person was seen getting into the vehicle with gun); Commonwealth v. Elysee, 77 Mass. App. Ct. 833, 841-842 (2010) (knowledge that occupants had previous firearms arrests were "one factor that may be considered by police in assessing the circumstances confronting them"); Commonwealth v. Nutile, 31 Mass.
                                                            -10-
App. Ct. 614, 618 (1991) (exit order justified where police saw codefendant get into car with gun and knew defendant possessed firearms in the past).[7]
            Here, there was nothing more. The police did not have a well-founded, reasonable fear that defendant was armed or posed a safety concern for the officers. Instead, upon learning of defendant's criminal history, the police decided to investigate the individuals in the Vehicle for possible drug distribution, although all they had was a hunch that the Vehicle's occupants were involved in drug distribution. If the facts in this case were sufficient to justify an exit order, then anyone with a prior record for drugs or an illegal firearm who commits a motor vehicle infraction may be subject to an exit order and a pat frisk of his person and a proximity search of his vehicle. This is not the law in Massachusetts.
ORDER
            Defendant's Motion to Suppress Evidence Observed and Seized by Law Enforcement (Docket #15) is ALLOWED.
/s/Peter B. Krupp Justice of the Superior Court
November 4, 2020
---------------------------
[7]In dicta in Commonwealth v. Wright, 85 Mass. App. Ct. 380 (2014), where there was no challenge to the exit order, the Court stated that "the officer properly could have ordered the defendant [and his passenger] to exit the vehicle based on their criminal histories," 85 Mass. App. Ct. at 384-385, which included convictions for possession of firearms. In Wright, however, there was far more than just the vehicle occupants' criminal histories, including questions about their identifications, the vehicles, and suspicious circumstances related to their travel. 85 Mass. App. Ct. at 383. Moreover, for the proposition quoted, Wright cites a number of cases where a driver or suspect's criminal history was just one factor in justifying a stop or exit order. See Id., citing Commonwealth v. Lawson, 79 Mass. App. Ct. 322, 327-828 (2011), Commonwealth v. Watts, 74 Mass. App. Ct. 514, 517-519 (2009), and Commonwealth v. Dasilva, 66 Mass. App. Ct. 556, 559-561 (2006).
                                                            -11-
xxz