## COMMONWEALTH vs. JEROMIE JOHNSON.

No. 11-P-1324.

Suffolk. May 8, 2012. - August 16, 2012.

Present: KAFKER, BROWN, & VUONO, JJ.

*Search and Seizure,* Threshold police inquiry, Motor vehicle, Reasonable suspicion. *Threshold Police Inquiry. Constitutional Law,* Search and seizure, Reasonable suspicion.

A Superior Court judge erred in denying a criminal defendant's pretrial motion to suppress a firearm found by police during a protective sweep of an automobile following a lawful traffic stop, where the officers who made the stop observed no furtive movements suggesting the concealment of weapons by either the defendant, who was driving, or his passenger, and where the officers also were not aware of any report of weapons, or of any criminal history of violence or weapons possession by the occupants of the automobile. [339-343]

INDICTMENTS found and returned in the Superior Court Department on July 2, 2009.

A pretrial motion to suppress evidence was heard by *Kimberly S. Budd,* J., and the cases were tried before *Elizabeth B. Donovan,* J.

*Kathryn Karczewska Ohren* for the defendant.

*Fabiola White (Paul B. Linn,* Assistant District Attorney, with her) for the Commonwealth.

KAFKER, J. The issue presented is whether a protective sweep of an automobile for weapons was justified in the instant case. The officers making this ordinary traffic stop observed no furtive movements suggesting the concealment of weapons by either the defendant, Jeromie Johnson, who was driving, or his passenger. The officers were also not aware of any reports of weapons, or any criminal history of violence or weapons possession by the occupants of the car, when they searched the

automobile.[1] We therefore conclude that the protective sweep of the automobile was not justified, and that the defendant's motion to suppress the firearm found in the backseat of the car, as well as other evidence, should have been allowed.

*Background.* After the defendant's motion to suppress was denied, he was convicted of unlawful possession of a firearm, third offense, in violation of G. L. c. 269, § 10(*a*) and (*d*), and unlawful possession of a loaded firearm, in violation of G. L. c. 269, § 10(*n*).[2] The defendant's sole contention on appeal relates to his motion to suppress. We therefore summarize the facts as carefully found by the motion judge, supplemented with uncontested evidence from the motion hearing. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007).

On April 30, 2009, Boston police Officers Dennis Medina and Brian Ball and State Trooper William Cameron were driving in an unmarked cruiser in a high-crime area of the Roxbury section of Boston. The vehicle in front of them failed to stop at a red light, instead making an illegal right turn without signaling. The officers followed this vehicle while they used the computer in their cruiser to look up information on it. They learned that it was owned by Patricia Felix, and that she had a valid driver's license, registration, and insurance for the vehicle. They decided to pull over the vehicle solely because of the traffic violations they had observed.

After they had proceeded for less than one-half mile, the officers activated their blue lights and pulled over the vehicle, which the defendant was driving.[3] Cameron stood behind the defendant's vehicle. Medina went to speak to the defendant, and Ball approached the passenger.

Medina asked the defendant for his license and registration.

---

[1]As discussed below, the defendant did, however, have prior convictions of possession of a firearm and other offenses. See note 9, *infra*.

[2]The defendant was acquitted of unlawful possession of ammunition and of a large-capacity firearm pursuant to G. L. c. 269, § 10(*h*) and (*m*).

[3]After the officers stepped out of their cruiser, the defendant's car "lurched" forward five to ten feet before stopping again, but traffic on the street was essentially stopped due to a nearby construction site. There was no suggestion that the officers perceived the "lurch" as an attempt to escape, in light of the traffic conditions.

The defendant did not look at Medina; instead, the defendant looked at the passenger and kept rubbing his hands on his thighs. After Medina repeated his request, the defendant, whose hands were shaking, fumbled with his wallet and retrieved his license. He also retrieved the registration from the glove compartment. He gave the documents to Medina within about one minute. He did not make eye contact with Medina. Medina testified that at no point were the defendant's hands out of Medina's sight, and that the defendant did not make any furtive gestures.

Meanwhile, Ball spoke to the passenger in the front seat and ascertained that she was Patricia Felix, the owner of the car. The defendant is her cousin. She appeared nervous; she did not maintain eye contact with Ball, and she alternately breathed heavily and shallowly. Ball testified that Felix made no furtive gestures, and Ball could see her hands.

After the defendant gave Medina his license and registration, Medina gave them to Ball to check the information in the computer. Medina told Ball that the defendant "shook," meaning that he was nervous. Ball discovered that the defendant had an outstanding warrant from the District Court for speeding and unauthorized use of a motor vehicle. Ball then returned to the car and asked the defendant to step out of the vehicle based on the warrant. The defendant disputed the validity of the warrant, stating that he had a recall slip[4] for it. Ball opened the defendant's door and asked him again to step out of the vehicle, and he complied. Ball performed a patfrisk of the defendant and found no weapons. He told the defendant that he should go to the rear of the vehicle and show the recall to Cameron if he had one. After being asked more than once to go to the rear of the vehicle, the defendant did so. While there, the officers saw him look into the rear of the vehicle twice. He did have some recall papers, but not for the relevant warrant. During this time, the defendant was nervous and upset, but he did not yell or threaten the officers.

---

[4]As Medina testified at trial: "[W]hen someone has a warrant issued to them and they've addressed it within the courts, they're given a green slip[.] [T]hey are supposed to keep it with them [so] if they are ever stopped again by police officers, they will know that their warrant has been cleared." We note this testimony only for the purpose of background information and have not relied upon any evidence from the trial in analyzing the motion to suppress.

At the same time, Medina was on the passenger side speaking with Felix. He observed that she was nervous and that she alternately looked at him and at the defendant. During his conversation with her, she stated several times that she was the owner of a hair salon and that the defendant had been in possession of the vehicle all day. Based on these statements and her nervousness, as Medina testified at the suppression hearing, he "didn't feel right about the whole situation, and . . . thought it was better to . . . have her step out of the vehicle." He ordered Felix out of the vehicle, and she complied.[5] Medina gave the exit order to Felix at approximately the same time as Ball's exit order to the defendant. The officers did not pat frisk Felix, as there were no female officers available to do so.

Following the exit orders to the defendant and Felix, Ball testified that he feared the defendant had a weapon in the vehicle. He therefore searched the vehicle, characterizing the search as a patfrisk of the defendant's "lunge area."[6] At this point, the defendant was with Cameron at the rear of the car. In the middle of the back seat, Ball found a towel in which he felt a hard, heavy object that turned out to be a firearm inside a sock. The officers then placed both the defendant and Felix in handcuffs, and read both the Miranda rights. Either before or after the Miranda warnings, the defendant indicated that he did not have a license for the firearm.[7]

*Discussion.* The defendant properly concedes that it was appropriate for the officers to stop his car because of the traffic violations. See *Commonwealth* v. *Santana,* 420 Mass. 205, 207 (1995). See also *Commonwealth* v. *Bacon,* 381 Mass. 642, 644 (1980). He also appropriately concedes that the officers could order him out of the car because of the outstanding warrant. Cf. *Commonwealth* v. *Pacheco,* 51 Mass. App. Ct. 736, 741 & n.3

---

[5]The propriety of this exit order is not material to our decision.

[6]The Commonwealth has not argued that Ball was engaging in a valid search incident to arrest. Compare *Commonwealth* v. *Young,* 78 Mass. App. Ct. 548, 552-555 & n.7 (2011), citing *Arizona* v. *Gant,* 556 U.S. 332, 342-344 (2009). See *Commonwealth* v. *Santiago,* 410 Mass. 737, 742-744 & n.9 (1991).

[7]After the warnings, during booking at the police station, the defendant spontaneously asked Medina whether it had been a regular traffic stop or if someone "called on" him. Medina told him that it had been a regular traffic stop.

(2001). He argues that the patfrisk of the car[8] violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Kimball*, 37 Mass. App. Ct. 604, 608 (1994). Cf. *Commonwealth* v. *Silva*, 366 Mass. 402, 408-409 (1974). If so, the firearm and his statements must be suppressed as fruit of the poisonous tree. See *Wong Sun* v. *United States*, 371 U.S. 471, 484-488 (1963); *Commonwealth* v. *Cruz*, 459 Mass. 459, 477 (2011). See also *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 (1982).

We accept the motion judge's factual findings unless clearly erroneous, but we determine independently the application of constitutional principles to the facts found. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990); *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). A protective sweep or "patfrisk" of a car must be justified by an officer's reasonable belief that his own safety or that of others is in danger. See *Commonwealth* v. *Santos*, 65 Mass. App. Ct. 122, 124-125 (2005). Such a belief must be rooted in "specific and articulable facts." *Id.* at 125, quoting from *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999). More than a hunch is required. *Commonwealth* v. *Santos, supra,* quoting from *Commonwealth* v. *Hooker,* 52 Mass. App. Ct. 683, 688 (2001). Mere nervousness by the defendant is not enough. *Commonwealth* v. *Brown,* 75 Mass. App. Ct. 528, 534 (2009). Moreover, "nervous or anxious behavior in combination with factors that add nothing to the equation will not support a reasonable suspicion that an officer's safety may be compromised." *Ibid.* See *Commonwealth* v. *Cardoso,* 46 Mass. App. Ct. 901, 901 (1998) (officer may not conduct patfrisk just because nervous defendant does not maintain eye contact).

Here, in addition to nervous behavior, the defendant had an outstanding arrest warrant, was slow to obey the officers' commands, argued with them, and repeatedly looked into the rear of the car. These additional factors make the reasonableness of the search a close question.

---

[8]It is not clear whether he is also objecting to the patfrisk of his person. Regardless, the patfrisk of his person did not produce any evidence against him.

Nonetheless, the arrest warrant was for nonviolent motor vehicle offenses. Cf. *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 687. The police officers had no reason to believe that either occupant had a history of weapons possession or dangerous crimes.[9] See *ibid.* Contrast *Commonwealth* v. *Calderon*, 43 Mass. App. Ct. 228, 229-231 (1997) (defendant's record included drug offenses, burglaries, and robbery). They had no specific information that anyone in the car had a weapon. Cf. *Commonwealth* v. *Davis*, 41 Mass. App. Ct. 793, 796 (1996), citing *Commonwealth* v. *Crowley*, 13 Mass. App. Ct. 915, 915 (1982). Contrast *Commonwealth* v. *Alvarado*, 427 Mass. 277, 283-284 (1998) (witness reported that passenger had sawed-off shotgun); *Commonwealth* v. *Santiago*, 53 Mass. App. Ct. 567, 571 (2002) (driver in traffic stop matched description of armed individual suspected of recent violent attacks).

The occupants of the car kept their hands in sight of the officers. Contrast *Commonwealth* v. *Robles*, 48 Mass. App. Ct. 490, 493 (2000); *Commonwealth* v. *Nunez*, 70 Mass. App. Ct. 752, 755 (2007). They made no furtive gestures suggesting that they might be reaching for or hiding weapons. Compare *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 665 (2001) ("[t]he fact that a motorist, when in the process of being stopped, leans over to the passenger side visor, cannot be considered as a threatening gesture"); *Commonwealth* v. *Santos*, 65 Mass. App. Ct. at 125-126 (not suspicious that defendant sat up in driver's seat and leaned forward). Contrast *Commonwealth* v. *Almeida*, 373 Mass. 266, 272 (1977) ("the defendant twisted to the right in the [driver's] seat at a time when the policeman could not observe his hands"); *Commonwealth* v. *Moses*, 408 Mass. 136, 138 (1990) (defendant ducked under dashboard); *Commonwealth* v. *Pena*, 69 Mass. App. Ct. 713, 719 (2007) (passenger refused to sit still and moved hands erratically). The defendant's glances into the back of the car were ambiguous and not the equivalent

---

[9]Although the defendant's conviction as a subsequent offender indicates that he did in fact have such a history, there was no evidence that the officers knew this when they decided to search the car. Cf. *Commonwealth* v. *Davis*, 41 Mass. App. Ct. 793, 796 (1996) (officer "had no knowledge of any facts about the defendant *before the frisk* that reasonably could have put the officer in fear for her safety" [emphasis supplied]).

of movements suggesting an attempt to conceal a weapon. *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 686-687.

Furthermore, when the patfrisk of the automobile was performed, the defendant was outside the car, under the watchful eyes of another officer. Finally, the officers outnumbered the occupants of the car. Compare *Commonwealth* v. *Brown*, 75 Mass. App. Ct. at 538, and cases cited.

As for Felix, as explained above, nothing suggested that she had any violent history or criminal record, and she kept her hands in view with no furtive movements. When the patfrisk of the automobile occurred, the officers already knew that she owned the car and had a valid license and registration, and there was no evidence that she was intoxicated or otherwise unable to drive the automobile if the defendant was arrested for the outstanding warrant. Felix was clearly very nervous and was stopped in a high-crime area. See *id.* at 533, 537-538 & n.8. But beyond this, the officers only considered suspicious her repeated statements that she had not been in her car all day.[10] She was nonconfrontational and obeyed the officers' instructions. The officers testified that once the stop was completed, had a gun not been discovered, she would have been free to leave. See *Commonwealth* v. *Robbins*, 407 Mass. 147, 149, 152 (1990). In the totality of the circumstances, even given the more problematic behavior of the defendant, the officers had no reasonable safety concerns relating to Felix. Cf. *Commonwealth* v. *Torres*, 424 Mass. 153, 159-160 (1997), and cases cited.

*Conclusion.* A protective sweep of an automobile for weapons must be based on reasonable fears for the safety of officers or others. The officers here had no reasonable concern based on specific, articulable facts that there might be weapons in the vehicle. Therefore, the firearm and other evidence resulting from the search (including the defendant's statements) should have been suppressed. Without the firearm or the defendant's statements, there was insufficient evidence to convict the defendant. Judgment shall therefore enter in his favor. See, e.g., *Commonwealth* v. *Alvarez*, 44 Mass. App. Ct. 531, 536 (1998); *Com-*

---

[10]There was no evidence clarifying whether these statements were responsive to questions posed by the officers.

*monwealth* v. *Brazeau*, 64 Mass. App. Ct. 65, 69 (2005); *Commonwealth* v. *Pierre*, 72 Mass. App. Ct. 580, 587-588 (2008).

> *Order denying motion to suppress reversed.*
>
> *Judgments reversed.*
>
> *Verdicts set aside.*
>
> *Judgments for the defendant.*