Macdonald, D. Lloyd, J.
Before the Court is the defendant’s motion to suppress large quantities of cocaine and heroin found in a “hide” located in the center console of the defendant’s car. The defendant had been arrested for driving with a suspended Massachusetts license following his being stopped on Interstate 95 for a routine marked lanes violation. His car was subsequently impounded. The motion is ALLOWED.
Facts
The evidentiary record consists of the testimony of Massachusetts State Trooper Christopher Booth (“Tpr. Booth” or “Booth”), photographs of the hide where the drugs at issue were found, the State Police inventory policy for towed vehicles and the stipulated affidavit of the K-9 officer Massachusetts State Police Sergeant Joseph King (“Sgt. King” or “King”) whose trained dog (“K-9 Kallie”) alerted to the location of the drugs that were seized. The defendant presented no testimony. The Court found Tpr. Booth entirely credible. As noted, Sgt. King’s affidavit was stipulated to by the parties. There are no contested facts.
Around 9:30 in the evening of November 21, 2011, Tpr. Booth was on routine patrol in a marked State Police cruiser proceeding southbound on Interstate 95 in North Attleboro. Ahead of him he noticed the defendant’s car, which had been traveling in the center lane, “drifting” to the right lane, such that after a short period of straddling the hatched lane markers, it proceeded entirely in the right lane. No direction signals were employed. Tpr. Booth had the defendant under observation for 30-40 seconds. The defendant was operating within the speed limit, and once the vehicle was in the right lane, it remained within the lane markers.
Drawing on his 6 1/2 years experience of patrolling the highways, Tpr. Booth believed that there was something abnormal about the manner of the lane change. It took longer “than if done on purpose”: it was as if the driver had “lost focus” and as if the driver completed the lane change only when he found himself between the lanes. In Booth’s judgment, the car was being operated in a manner — as he had seen many times before — by an impaired driver, such as one under the influence of alcohol.
Believing that a “marked lanes" violation under G.L.c. 89, §14A or aviolation of G.L.c. 90, §14B (failing to give direction signal) had occurred, Tpr. Booth activated his blue lights to pull over the defendant’s vehicle. At the time he did so, Booth had no idea that the defendant was Hispanic.
The defendant responded to the lights appropriately by pulling over to the breakdown lane without incident.
As he approached the defendant’s vehicle, Tpr. Booth noticed that the defendant was the sole occupant of the car. There were no overhead highway lights. *319 Only the lights of the passing cars, the cruiser’s lights and Booth’s flashlight illuminated the scene. When the defendant came into Booth’s view, Booth immediately noted that the defendant’s hands were visibly shaking and that his forehead was perspiring. Booth further noticed that the interior of the car was unusually clean, that the ignition key had no attached trinkets or additional keys and that there was a very strong odor emanating from an air freshener.
Tpr. Booth asked the defendant for his license and registration. The defendant produced a Rhode Island license and a registration. When Booth asked who owned the car, the defendant responded with the last name of Soto, but without a first name. When asked where he was headed, the defendant first responded Providence but then changed his stated destination to Attleboro. When Booth ran the vehicle’s registration, the response confirmed that it was owned by a person with the last name of Soto. On inquiiy, the defendant’s Rhode Island license was active; however, Booth was soon informed that the defendant’s license to operate in Massachusetts was suspended. Booth made a warrant check, and there were no outstanding warrants on the defendant.
Although the defendant had made no furtive movements from the time Booth had activated his lights to pull the defendant over, on the basis of the combined circumstances noted above, Booth concluded that there was something “not normal” and suspected that criminal activity was afoot. For his own safety, Booth ordered the defendant out of the car because it was dark and he had no back-up on the scene. Also for his safely, Booth frisked the defendant. No weapon or contraband was found. Shortly thereafter, Booth performed what he characterized as a “search” of the interior of the floors of the vehicle for evidence. He was “half in/half out” at the time that he did so. Booth found “dozens” of elastic bands that he believed were consistent with the packaging of narcotics.
Booth then decided to place the defendant under arrest for operating with a suspended license. He did so rather than to permit the defendant to respond to a citation by summons. In response to the Court’s question as to what factors he takes into account in making that decision, Booth said that there was “no rhyme or reason” to it, but that in this instance it was because of the accumulated suspicious circumstances. Booth provided the defendant with a Miranda card in Spanish. The defendant made no subsequent incriminating statements.
Booth then radioed for a tow truck and instructed that the car be towed to the State Police Barracks. Acting on his suspicion arising from the defendant’s demeanor, the strong air freshener smell, the car’s cleanliness and the unadorned ignition key, Booth also requested that a K-9 officer come to the barracks to have a trained narcotics detection dog sniff the vehicle for drugs. The total elapsed time between the initial stop and the vehicle being towed was approximately 30 minutes.
The defendant’s car was towed to the barracks. Booth had not complied with the State Police policy directive requiring that an inventory be made of the contents of a vehicle before it was towed for impoundment. Exhibit 4.
At approximately 11:30, Sgt. King arrived with K-9 Kallie. K-9 Kallie was a trained and certified drug detection dog. Booth requested that Sgt. King do a complete search of the car. King proceeded first with the dog doing a sniff of the vehicle’s exterior. K-9 Kallie did not alert to any aspect of the exterior. King then directed K-9 Kallie into the interior. In short order, K-9 Kallie alerted to the center console.
Several other officers were present at that juncture, and they hand-searched the area, with no results. However, the officers discovered what appeared to be “after-market” wiring. Power was then supplied to the wiring, and the entire center console between the driver and the passenger opened “back to front.” Inside the then-exposed compartment was found a “fist size” of white powder consistent with cocaine. Also found was a plastic bottle wrapped in duct tape and a ball of tin foil, both of which contained substances consistent with either heroin or cocaine. The defendant is charged with trafficking in cocaine in 28 or more grams and trafficking in heroin in 14 or more grams.
Discussion
The Commonwealth has the burden of proof by a preponderance of the evidence that there were grounds to support an exception to the warrant requirement under the 4th Amendment and Article 14 of the Declaration of Rights. Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974). See also Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).
The Stop
The Court is satisfied that Booth had reasonable grounds to pull the defendant’s vehicle over for a traffic infraction. G.L.c. 90, §14B requires that an operator “before . . . making any turning movement which would affect the operation of any other vehicle, shall give a plainly visible signal by activating... directional lights or signal ...” Changing lanes (even “drifting”) involves a turning movement, and the defendant failed to employ his directional signals.[1]
The Exit Order
The combined circumstances confronting Booth on the unlit side of a busy interstate in the middle of the night justified his exit order. “While a mere hunch is not enough ... it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safely concerns, and, if the basis is there, a court will uphold the order.” Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999), as quoted in Commonwealth v. Feyenord, 445 Mass. 72, 75-76 (2006).
*320 The Preliminary Search of the Car
Booth candidly described that while “half in/half out” of the defendant’s car, he “searched” it and found the suspicious elastics. The Appeals Court has recently addressed the merits of such a search in circumstances materially similar to those present here. “A protective sweep or ‘patfrisk’ of a car must be justified by an officer’s reasonable belief that his own safety or that of others is in danger. Such a belief must be rooted in ‘specific and articulable facts.’ More than a hunch is required. Mere nervousness by the defendant is not enough. Moreover, ‘nervous or anxious behavior in combination with factors that add nothing to the equation will not support a reasonable suspicion that an officer’s safety may be compromised.’ ” Commonwealth v. Johnson, 82 Mass.App.Ct. 336, 340 (2012) (citations omitted).
With the defendant out of the car, with no weapons or contraband having been found on him and no other objective indicia that would reasonably suggest the likelihood that a weapon was secreted in the vehicle, there simply was an insufficient basis for Tpr. Booth to further search the vehicle.
The Interior K-9 search
As noted, when Sgt. King arrived with K-9 Kallie, he first directed the dog to do an exterior sniff for narcotics. The exterior sniff implicated no privacy interests of the defendant. Feyenord, 445 Mass. at 82-83. However, the subsequent interior sniff was, by Booth’s and King’s own description, a full-blown search. For that, probable cause that contraband or a weapon was inside was required. Commonwealth v. Garden, 451 Mass. 43, 51 (2008).
Even if the suspicious elastics which Booth discovered in the course of his “pat frisk” of the car were lawfully seized, they did not so strengthen the otherwise ambiguous suspect circumstances as to rise to the level of probable cause. Without the elastics in the mix, Booth and King had no more “specific and articulable facts” pointing to criminal activity than Booth had at the roadside. Accordingly, as productive as K-9 Kallie’s search proved to be, it was without a lawful justification, and its fruits must be suppressed.[2]
ORDER
The defendant’s motion is ALLOWED. The seized evidence is suppressed.

 A marked lanes violation, however, was not established. G.L.c. 89, §4A (the “marked lanes” statute) provides: “When any way has been divided into lanes, the driver of the vehicle shall so drive that the vehicle shall be entirely within a single lane, and he shall not move from the lane in which he is driving until he has ascertained if such movement can be made safely."The defendant did not straddle the lanes for any significant period. Rather, by Booth’s account, he merely moved from one lane to another slower than Booth was accustomed to see. Nor is there evidence that the manner of the lane change posed any safety concern.

 Although, as noted, the Court found no suggestion that Tpr. Booth’s stop of the defendant was motivated by what was later determined to be his Hispanic origin or any other impermissible consideration, the facts of this case give resonance to Justice Greaney’s remarks in his concurring opinion in Feyenord
In our democratic society, special concern must be vigilantly exercised by the courts to balance the rights of the police under the principles of Terry v. Ohio, 392 U.S. 1 (1968) (which have expanded considerably over the years since Terry was decided), with the protections afforded less powerful citizens who often feel the brunt of Terry-type stops. Many of these citizens (some even noncitizens), because of their economic standing, will be driving vehicles with defective equipment or driving them without proper licenses or registrations. Moreover, these vehicles will frequently be operated in areas of cities that have known drug zones (Lowell, Holyoke, Springfield, parts of Boston, [including the cities of Bristol County]). The police, endeavoring to stamp out drug commerce and use, will invariably be making traffic stops in these zones. The lack of a license or proper registration or the commission of a routine traffic violation, coupled with nervousness, or even some evasion on the part of the operator or others in the vehicle, may provide a basis to continue detention under Terry principles, but should not, by themselves, provide a basis to bring in a drug-sniffing dog.
445 Mass. at 87.