NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-1992                                            Appeals Court

   COMMONWEALTH  vs.  JASON DOUGLAS (and five companion cases[1]).


                        No. 12-P-1992.

     Suffolk.     January 13, 2014. - September 30, 2014.

          Present:  Cypher, Rubin, & Hines, JJ.[2]


Firearms.  Constitutional Law, Search and seizure.  Search and
     Seizure, Motor vehicle, Threshold police inquiry,
     Protective frisk.  Evidence, Firearm.  Threshold Police
     Inquiry.  Practice, Criminal, Motion to suppress.



     Indictments found and returned in the Superior Court
Department on September 28, 2011.

     Pretrial motions to suppress evidence were heard by Janet
L. Sanders, J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Robert J. Cordy, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by him to the Appeals Court.

_____

     [1] Two of the companion cases are against Douglas, and three
are against Wayne Steed.

     [2] Justice Hines participated in the deliberation on this
case while an Associate Justice of this court, prior to her
appointment as an Associate Justice of the Supreme Judicial
Court.

Elisabeth Martino, Assistant District Attorney (Joseph Janezic, Assistant District Attorney, with her) for the Commonwealth.
Michael Tumposky for Jason Douglas.
Daniel R. Katz for Wayne Steed.

CYPHER, J.  This is an appeal by the Commonwealth after a single justice of the Supreme Judicial Court allowed the Commonwealth's petition under Mass.R.Crim.P. 15, as appearing in 422 Mass. 1501 (1996).  In ruling on the defendants' motions to suppress, a judge in the Superior Court held that the seizure by police officers of a firearm found under a passenger's seat during a "patfrisk" of the interior of a motor vehicle was impermissible because, although the stop of the vehicle was justified, the police had exceeded the permissible scope of the search when they looked under the passenger's seat before the occupants returned to the vehicle.  Specifically, the judge reasoned that "[a]ny suspicion which might have been prompted by any movement (or lack thereof) by the car's occupants was dispelled by the removal and pat frisk of each individual's person."[3]  We reverse the order allowing the motions to suppress.

---

[3] The Commonwealth argues, with merit, that the defendants' motions to suppress did not meet the requirements of Mass.R.Crim.P. 13, as appearing in 442 Mass. 1516 (2004).  The judge noted that the affidavits were deficient, but in light of the readiness of defense counsel to remedy any defect and the Commonwealth's willingness to proceed, the judge determined that the issue of the inadequacy of the filings was moot.  We agree that the affidavits failed to meet the requirements of rule 13

1.  Standard of review.  "[W]e accept the motion judge's subsidiary findings of fact absent clear error."  Commonwealth v. Sinforoso, 434 Mass. 320, 321 (2001), quoting from Commonwealth v. Sanna, 424 Mass. 92, 97 (1997).  "We review de novo the judge's application of constitutional principles." Commonwealth v. Martin, 467 Mass. 291, 301 (2014).  We must assess the reasonableness of a police officer's actions based upon the "circumstances confronting the officer in the field, not those facing the judge in the tranquility of the courtroom." Commonwealth v. Dedominicis, 42 Mass. App. Ct. 76, 79 (1997) (citations omitted).

2.  Facts.  The following facts are taken from the judge's findings, supplemented by the uncontested and uncontroverted testimony of the only witness at the hearing, Boston police Officer Liam Hawkins, who was implicitly credited by the judge. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).  On the evening of April 7, 2011, a party was held at the Felt Night Club (Felt) in downtown Boston to celebrate the success of a video posted to the video sharing Web site YouTube and produced by a group whose members lived on Annunciation Road in Boston.  Members of this group were engaged

_____

and caution counsel to adhere to the procedural requirements of the rule.  See Commonwealth v. Robie, 51 Mass. App. Ct. 494, 499 (2001); Commonwealth v. Johnston, 60 Mass. App. Ct. 13, 19-20 (2003).

in a long-standing and sometimes violent rivalry with a group centered in the Orchard Park housing development, and YouTube videos produced by the two groups had at times been a source of some of the violence. The Boston police department's youth violence strike force conducted surveillance at the event, to be present in case members of a rival group showed up, to see which other groups' members might have attended to get a sense of the current status of shifting alliances among groups in the city of Boston, and in case "anything sticks out." The police on the night in question also followed and stopped some departing attendees.

Boston police Officers Liam Hawkins and his partner, Mathew Wosny, were stationed in the vicinity of Felt that night as part of the surveillance operation in a "take down" vehicle, one that was designated to be available to assist should the officers conducting surveillance require it. At about 3:12 A.M., they received a radio dispatch from Sergeant Detective Joseph Sullivan, who was conducting surveillance at a restaurant in the Chinatown section of Boston, where some of the party attendees had gone, reporting that the defendant Jason Douglas had left the restaurant accompanied by two men. The three men had been followed by the police to the restaurant from the party at Felt. Sergeant Sullivan informed the other officers that Douglas appeared agitated and was punching his own hand and expressing a

desire to leave the area. Sergeant Sullivan also reported that one of the two men with Douglas -- this turns out to have been defendant Wayne Steed -- was wearing a blue hooded sweatshirt and had one hand held tightly to his body in the front pocket of the sweatshirt. The men entered a Toyota Camry automobile driven by a woman who had pulled up at the curb. The driver had failed to use her turn signal as she turned out of the parking lot. After the men got in, the vehicle departed. At approximately the same time, a fight broke out in the parking lot of the restaurant.

Officer Hawkins, who was stationed close by, caught up with the vehicle in his unmarked cruiser and noticed that the driver again failed to signal when turning. He pulled over the vehicle based on this civil infraction. Officers Hawkins and Wosny approached the vehicle and saw four people inside. The driver was a woman later identified as Rheanna Reese. The defendant Douglas was seated in the front passenger seat, while the defendant Steed was seated in the back with an individual identified as Shakeem Johnson. Johnson was seated behind the driver, while Steed was behind the front passenger.

Officer Hawkins was familiar with both Johnson and Douglas. He testified that he had previously encountered Douglas upwards of fifty times both in the course of his ordinary duties in his assigned district and through his work on the youth violence

strike force. He knew that Johnson had a criminal record that included both crimes of violence and drug offenses. He also knew that Douglas had a previous criminal record, including specifically at least one firearms conviction. He testified that both Douglas and Johnson had been under specific surveillance when they went from Felt to the restaurant. While Officer Hawkins was "loosely familiar" with Steed, he did not know him well enough to recognize him by name.

As Officer Wosny approached the vehicle, and before he reached the driver's window, he observed that Johnson had one arm stretched across the front of his torso near his waist. Officer Hawkins observed that "Johnson was kind of pivoted to the right and leaning in towards the middle of the vehicle." Officer Wosny ordered Johnson out of the vehicle and conducted a patfrisk. Johnson was heavily intoxicated, to the point where he was "unsteady on his feet." The officer found nothing during the patfrisk, and the officers thought that the movements in the vehicle may have been caused by Johnson trying to remove his seatbelt to exit the vehicle or to make it appear that his seatbelt had been fastened.

Officer Hawkins observed that Steed had his hands resting on the outside of the pocket of his hooded sweatshirt, rather than inside them, that he appeared to be clutching something in the pocket, that he was staring straight ahead, not looking

around, and that he was avoiding eye contact. Concerned that, based on his training and experience, this behavior might indicate that Steed possessed a weapon, Officer Hawkins ordered him out of the vehicle. Steed continued to avoid eye contact with the officers, questioned why the officers wanted him to get out, and had to be asked three times before he got out of the vehicle. On Steed's exit, the officer could see an open bottle of an alcoholic beverage on the floorboard sticking out from under the front passenger seat. A patfrisk of Steed revealed nothing.

As Officer Hawkins performed the patfrisk of Steed, Douglas opened the front passenger door and got out of the vehicle without being asked to do so. Officer Hawkins testified based on his previous encounters with Douglas that "[n]ormally he's very casual, he's calm, we talk normally," but that on the night of the stop Douglas seemed "[d]ifferent." Douglas is large and muscular, and in the circumstances, Officer Hawkins wanted to make sure Douglas was contained. Officer Hawkins explained that in his experience when individuals at traffic stops have exited vehicles unbidden they have, in some instances, been armed.

Because both officers were already occupied, Officer Hawkins ordered Douglas to get back in the vehicle, addressing him by his first name, and Douglas complied. However, once Douglas was back in the vehicle, Officer Hawkins saw him shift

the vehicle from park into drive and say something to the driver, Reese. Officer Hawkins was worried that Douglas might try to flee, and was also concerned for his own safety, because he was positioned between the vehicle and a jersey barrier by the side of the road. He ordered Douglas to shift the vehicle back into park and told him not to move. Douglas complied. Officer Wosny immediately removed Reese from the vehicle to prevent her from driving away, while Officer Hawkins asked Douglas to exit and performed a patfrisk of him. The patfrisk of Douglas revealed nothing.

Following the patfrisk of Douglas, all four occupants had been removed from the vehicle and were either sitting or leaning on the jersey barrier by the road. Officer Hawkins approached the front passenger door of the vehicle, which was still open. He shined a flashlight under the front passenger seat where Douglas had been seated, crouched down to look under the seat, and observed a revolver.[4] All four occupants of the vehicle were then handcuffed and detained. Defendants Douglas and Steed were both charged with possession of the firearm.

3. Discussion. "Where the police have observed a traffic violation, they are warranted in stopping a vehicle."

---

[4] Although the judge stated that the officer had leaned in the back door of the car, the testimony at the hearing was that Hawkins leaned in the front door.

Commonwealth v. Bacon, 381 Mass. 642, 644 (1980). The subjective motivation of the police does not limit their power to make an authorized motor vehicle stop. Commonwealth v. Santana, 420 Mass. 205, 207 (1995). The stop in this case was permissible.

The exit order and patfrisk of the occupants were also permissible. During a motor vehicle stop "an exit order is justified where the police have 'a reasonable belief that the officer's safety, or the safety of others, is in danger.' . . . 'Reasonable belief' is shorthand for a reasonable, articulable suspicion." Commonwealth v. Elysee, 77 Mass. App. Ct. 833, 840 (2010), quoting from Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999), S.C., 432 Mass. 613 (2000). "To support an order to a passenger to alight from a vehicle stopped for a traffic violation . . . the officer need not point to specific facts that the occupants are 'armed and dangerous.' Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." Commonwealth v. Stampley, 437 Mass. 323, 326 (2002), quoting from Commonwealth v. Gonsalves, supra at 665.

A patfrisk of a lawfully stopped individual is justified by reasonable suspicion that the individual is armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 27 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Ibid. "The purpose behind the protective measures allowed by Terry is to enable an officer to confirm or dispel reasonable suspicions that the stopped suspect may be armed with a weapon . . . ." Commonwealth v. Pagan, 440 Mass. 62, 68 (2003).

Here, there was information that the occupants of the vehicle at least associated with group members; they had been at the Annunciation Road group's party earlier in the evening to celebrate a YouTube video; such videos had provoked gang violence in the past; two of these individuals who associated with group members, Johnson and Douglas, were known by the police to have committed violent crimes in the past; Douglas had committed a firearms offense; Douglas was known to the police, who had encountered him over fifty times; Officer Hawkins was familiar with Douglas from his work on the youth violence strike force, a group of Boston police officers engaged in proactive patrol to reduce violence among youthful offenders and young adults and to curb firearm violence in Boston; Officer Hawkins

was aware that Douglas had instances of violence and at least one firearms conviction in his criminal history; Officer Hawkins knew Douglas well enough to address him by first name; Officer Hawkins had seen Johnson "all the time in the [An]nunciation Road, Mission Hill area" and Johnson had instances of violence and drug offenses in his criminal record; and before the officers arrived at the vehicle driver's window where they could have sought the driver's license and the vehicle's registration, Johnson was observed pivoting and leaning toward the center of the vehicle and holding one arm across his body as if he might be trying to hide something.

In combination with the other evidence described above, the pivoted position in which the police found Johnson further supported a reasonable suspicion that he was trying to hide or access a weapon. Officer Hawkins testified that Steed, who had been seen coming from the Felt party, had been seen outside the restaurant after 3:00 A.M. with one hand tight to his body inside the pocket of his sweatshirt while entering the vehicle. Officer Hawkins observed Steed sitting in the vehicle in a manner that suggested that he might have a weapon in the pocket of his sweatshirt. Steed also behaved oddly -- staring straight ahead in a way that, Officer Hawkins said, "alarmed" him -- and initially resisted the officers' requests that he get out of the vehicle. Furthermore, Douglas's conduct that at the time of the

stop was unlike his usual "very casual, . . . calm" self, and he got out of the vehicle unbidden, which objectively heightened the reasonable suspicion that the occupants of the vehicle were armed and dangerous.[5]  After being ordered back into the vehicle and returning to it, Douglas put the vehicle in gear as if to drive away and said something to the driver.  He did so while his fellow passengers were outside the vehicle and a police officer was standing between the vehicle and the jersey barrier.

These facts and circumstances justified the protective search of the interior of the vehicle.  "[I]n appropriate circumstances a Terry type search may extend into the interior of an automobile."  Commonwealth v. Almeida, 373 Mass. 266, 270 (1977).  "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the

---

[5] Douglas's conduct is thus distinguishable from that of the passenger in Commonwealth v. Torres, 424 Mass. 153, 159 (1997), where the court found only an exit order, but no further inquiry, was supported by a passenger exiting a stopped vehicle unbidden and after a delay when a police officer tapped on his window.  There the court said, "It is not unnatural for either the driver or the passenger in an automobile (or both) to get out of the vehicle to meet a police officer who has signalled the vehicle over to the side of the road."  Ibid.

suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983), quoting from Terry v. Ohio, 392 U.S. at 21.

A Terry-type "frisk" of the interior of an automobile may be justified under art. 14 of the Massachusetts Declaration of Rights by the concern that a driver or passenger returning to the vehicle may gain access to a weapon that may be used against the police, even though the driver and any passengers are permitted to reenter the vehicle and go on their way. See Commonwealth v. Almeida, 373 Mass. at 272 (allowing "frisk" of car where defendant "was not under arrest at the time of the 'pat-down' search of his person, and there was no assurance that he would not be returning promptly to his seat behind the wheel of the automobile"); Commonwealth v. Lantigua, 38 Mass. App. Ct. 526, 528 (1995) (before allowing defendant to reenter car to obtain registration, officers could properly effect Terry-type search of areas of car that would be readily accessible to defendant on reentering); Commonwealth v. Cruz-Rivera, 76 Mass. App. Ct. 14, 18 (2009), quoting from Commonwealth v. Stack, 49 Mass. App. Ct. 227, 234 (2000) (patfrisk may legitimately extend into interior of automobile even where, as here, patfrisk of defendant did not reveal weapons and police were prepared to release him, "but police are 'confined to what is minimally necessary to learn whether the suspect is armed and to disarm

him once the weapon is discovered'"); Commonwealth v. Graham, 78 Mass. App. Ct. 127, 129 (2010) (justification for patfrisk entitled officer to also conduct protective sweep of vehicle confined in scope to intrusion reasonably designed to discover weapon, where concern extended to threats that might arise from retrieval of weapon in vehicle by occupant who was not placed under arrest); Commonwealth v. Myers, 82 Mass. App. Ct. 172, 177-178 (2012) (justification for patfrisk of driver entitled police to conduct protective sweep of vehicle even though driver sat in back seat of cruiser after patfrisk and could no longer have reached inside vehicle, because he could have returned to vehicle and recovered hidden weapon at end of encounter).

The judge concluded that because the patfrisks of each passenger revealed nothing, reasonable suspicion that the occupants of the vehicle could be armed had been dispelled. We disagree. The reasonable suspicion that the occupants of the vehicle are dangerous and may possess a weapon (although not on their person) did not in these circumstances dissipate with the failure to locate immediately the weapons reasonably believed to justify the initial frisk. "[I]f nothing developed during the stop that created probable cause, the police would shortly have been required to let [the group] go." Commonwealth v. Santiago, 53 Mass. App. Ct. 567, 571 (2002). As expressed by the United States Supreme Court, "[i]f a suspect is 'dangerous,' he is no

less dangerous simply because he is not arrested." Michigan v. Long, 463 U.S. at 1050.

In these circumstances, the protective frisk of the interior of the vehicle was justified by the reasonable suspicion that permitted the officers to issue the exit order and pat frisk the occupants. Although circumstances may arise where a patfrisk of the vehicle's occupants would dispel the apprehension of danger and render a subsequent protective frisk of the vehicle's interior impermissible, this is not such a circumstance. In the usual case, as here, the reasonable suspicion that permitted the officers to issue an exit order and pat frisk the occupants continues to exist and warrants a protective frisk of the vehicle's interior when a weapon is not immediately discovered in a patfrisk of the person. Indeed, if police officers are required to conclude that the reasonable suspicion that existed before the patfrisk of a person is dispelled by a patfrisk that reveals no weapon and are not permitted a protective frisk of the interior of the vehicle, then, as best expressed by Justice Harlan, "the answer might be a bullet." Terry v. Ohio, 392 U.S. at 33 (Harlan, J., concurring).

The order allowing the defendants' motions to suppress is reversed, and a new order shall enter denying the motions.

So ordered.

RUBIN, J., (concurring in the judgment, with whom Hines, J., joins).  Although I agree that the order allowing the motions to suppress must be reversed, and with the majority's method of analysis, I write separately to state explicitly that, in the context of a lawful automobile stop, before police officers may, under art. 14 of the Massachusetts Declaration of Rights, undertake a Terry-type search, or "patfrisk," of the interior of a motor vehicle, see Terry v. Ohio, 392 U.S. 1, 27 (1968), they must have not only reasonable suspicion that an occupant is armed and dangerous, but also reasonable suspicion "based on specific, articulable facts that there might be [a] weapon[] in the vehicle."  Commonwealth v. Johnson, 82 Mass. App. Ct. 336, 342 (2012).  And, as I explain, because I would not hold as the majority does that the motion judge erred in determining that during the time Johnson and Steed were outside the vehicle, the reasonable suspicion they were armed and dangerous dissipated, I necessarily reach the conclusion that the order must be reversed through a somewhat different route than the majority.

It is "settled that in appropriate circumstances a Terry type search may extend into the interior of an automobile."  Commonwealth v. Almeida, 373 Mass. 266, 270 (1977).  The authority for such a further intrusion into an individual's privacy must be evaluated based on all the facts and

circumstances. It does not necessarily arise whenever there is reasonable suspicion warranting a patfrisk of someone in a car. In order to be lawful, a search or seizure must be tailored to its justification. See, e.g., Commonwealth v. Silva, 366 Mass. 402, 407-408 (1974), quoting from Terry v. Ohio, 392 U.S. at 19 (A "search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible. . . . [A permissible] search is thus confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered"). Thus, as the leading treatise on the law of the Commonwealth with respect to suppression states, "[t]he scope of a frisk is circumscribed by the rationale for the frisk." Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 5-4[a], at 5-12 (2013/2014 ed.). "[E]ven a patfrisk that is 'valid in its inception' may be 'excessive in its scope.'" Commonwealth v. Cruz-Rivera, 76 Mass. App. Ct. 14, 18 (2009), quoting from Commonwealth v. Silva, supra at 407. Therefore, as this court has recently explained, if in all the circumstances there is "no reasonable concern based on specific, articulable facts that there might be weapons in [a] vehicle," a search of its interior is not permitted. Commonwealth v. Johnson, 82 Mass. App. Ct. at 342. Consistent with this, even when our appellate courts have concluded that an initial patfrisk of an occupant of a car was

lawful, they have analyzed separately the question whether a further protective search of the passenger compartment of the car is within the permissible scope of that search, asking whether such a search was justified by reasonable suspicion that the suspect might gain control of a weapon from within the car and use it against the officers.  See, e.g., Commonwealth v. Silva, 366 Mass. at 407-408; Commonwealth v. Cruz-Rivera, 76 Mass. App Ct. at 18.  See also Commonwealth v. Silva, supra at 408 (further search of car is permitted only where it will serve "a protective end").

Because the facts that justify a patfrisk of the occupant of a car may not justify a further search of it, there may be circumstances, as the majority explains, where a lawful patfrisk that reveals nothing dispels what reasonable suspicion there was, so that a further search of the car will be impermissible. Imagine, for example, that a police officer stops a car for speeding with no reason to think the driver is dangerous.  The officer goes to the driver's window and sees under the driver's jacket what he thinks is a holster.  Assuming that provides a sufficient basis for reasonable suspicion that the driver is armed and dangerous, the officer might permissibly order the driver out of the car and frisk him in order to allow the officer to "quickly confirm or dispel [his] suspicion." United States v. Place, 462 U.S. 696, 702 (1983).  See Commonwealth v.

Pagan, 440 Mass. 62, 68 (2003) ("The purpose behind the protective measures allowed by Terry is to enable an officer to confirm or dispel reasonable suspicions that the stopped suspect may be armed with a weapon").  If the patfrisk reveals the driver is wearing not a holster, but a back brace, the officer's suspicion will be dispelled.  There would no longer be any basis for suspicion of the driver, and a further search of the car would be impermissible.  Cf., e.g., United States v. Austin, 269 F. Supp. 2d 629, 634 (E.D. Pa. 2003) (where officer's suspicion justifying patfrisk was based solely on his belief driver reached for weapon, search of car unlawful because once officer "realized that [the defendant] had reached for a cell phone, not a weapon, there was no reason to believe that he was dealing with an armed or dangerous individual").

Of course, in many cases, the same facts that give rise to reasonable suspicion the occupant of a car is armed and dangerous will justify a Terry-type search of the interior of the car.[1]  There will be reasonable suspicion not merely that the

---

[1] While often described as a "patfrisk" of the interior of an automobile, see, e.g., Commonwealth v. Cruz-Rivera, 76 Mass. App. Ct. at 18, what is permitted in these circumstances is actually "a protective search for weapons only." Commonwealth v. Almeida, 373 Mass. at 271 n.2.  As the Supreme Judicial Court has explained, given the justification for the search, "the search must be confined to the area from which the suspect might gain possession of a weapon," id. at 272, and must be limited "to what is minimally necessary to learn whether the suspect is

occupant is carrying a weapon on his person, but that, even if he is not carrying a weapon on his person at the time of the patfrisk, he may have one in the car. In such circumstances, absent some other development, a patfrisk of the individual that reveals nothing will not dispel the officer's reasonable suspicion. And, as the majority explains, in these circumstances, a protective search of the car may be permissible even if the individual is to be allowed to go on his way. See, e.g., Commonwealth v. Almeida, 373 Mass. at 272 (allowing "frisk" of car where defendant "was not under arrest at the time of the 'pat-down' search of his person, and there was no assurance that he would not be returning promptly to his seat behind the wheel of the automobile").

The majority concludes that there was reasonable suspicion that Johnson was armed and dangerous -- that he either had a weapon on his person, or had one in the car -- at the point at which Johnson pivoted toward the center of the back seat of the car. The majority concludes that in this case, the suspicion was not dispelled by the patfrisk of Johnson that revealed no weapon. Likewise, the majority concludes that Steed's own conduct, including "sitting in the vehicle in a manner that suggested that he might have a weapon in the pocket of his

armed and to disarm him once [any] weapon is discovered." Commonwealth v. Silva, 366 Mass. at 408.

sweatshirt," _ante_ at     , something observed after Johnson was removed from the car, created at that point reasonable suspicion that he was armed and dangerous and that he had a weapon either on his person or in the car.  This suspicion, too, the majority concludes, was not dispelled by the patfrisk that found nothing.  Finally, the majority says that Douglas's conduct only "heightened the reasonable suspicion that the occupants of the vehicle were armed and dangerous," _ante_ at     , implying that he might have been thought to have a weapon on his person or in the car based only on the suspicion that attached to the other two.  The suspicion of Douglas, the majority concludes, also was not dispelled by the patfrisk of Douglas that found nothing.  The majority thus holds that, with or without the circumstances that later arose, there was suspicion of each occupant at the time of his exit order sufficient to justify the search of the car, and that, with respect to each, the patfrisk did not serve to dispel that suspicion.  "[T]he protective frisk of the interior of the vehicle was justified by the reasonable suspicion that permitted the officers to issue the exit order and pat frisk the occupants."  _Ante_ at     .[2]

---

[2] The majority does assert at one point that all the "facts and circumstances justified the protective search of the interior of the vehicle," _ante_ at     , but if, as the majority concludes, the suspicion of each passenger was not dispelled by the patfrisk, it would seem necessarily to follow that the

I agree that at the time of the search the officers in this case had reasonable suspicion based on articulable facts that the car may have contained a weapon, and that the search of the car's interior therefore was justified. But I do not base my conclusion on the initial suspicion aroused by either Johnson or Steed. The experienced motion judge concluded that at the time of the stop, the police had insufficient facts to support an exit order or a patfrisk of any of the occupants of the car. She concluded that Johnson's movements toward the center of the back seat warranted the order that he exit and his patfrisk. But she found as a fact that after finding nothing on Johnson's person, the police "conclud[ed] that what Johnson was in fact doing inside the car was removing his seatbelt" -- as one officer testified, they determined the actions that had made them suspicious had been "innocent." The judge thus held that in light of this, Johnson's actions gave the police no basis to search the car.

Given the judge's finding of fact, it is difficult to conclude that her legal determination was in error. I need not

---

initial basis for suspecting him sufficed to allow a further search of the vehicle. At the end of the day, my analysis is applicable whichever is the basis for the majority's conclusion since, in either event, we would not rely on the initial suspicion aroused by either Johnson or Steed in reaching our conclusion that there was reasonable suspicion the vehicle contained a weapon.

decide the question, however, because even assuming she was correct to this point, I think the suppression motion still should have been denied.

The judge also concluded that Steed's behavior, particularly, when the officers approached the vehicle, his having his hands outside the front pocket of his sweatshirt, apparently, according to Officer Liam's testimony "as if they were clutching something," provided the officers with reasonable suspicion only that, as he sat in the car, he was holding a weapon in the front pocket of his sweatshirt.[3] The motion judge concluded that this justified the order that he get out of the vehicle and a patfrisk of his person, but when the patfrisk revealed that he did not in fact have a weapon on his person, what suspicion there had been was dispelled. She held that his actions, too, thus provided no basis for the police to search the car. The majority concludes this, too, was error. That also is a difficult position to maintain, but we again need only

---

[3] Officer Hawkins testified that a Sergeant Sullivan, who did not testify, reported to Officer Hawkins that as Steed, who was not known to the officers, entered the vehicle after leaving the Chinese restaurant, he had his hand in the front pocket of his sweatshirt, "was maintaining his right hand in there, holding it tight to his body." The motion judge stated that "[b]ecause Sullivan did not testify, precisely what he saw and what he suspected based on these observations was not made clear to this Court." In any event, neither the Commonwealth nor the majority asserts that the police had reasonable suspicion that Steed was armed and dangerous prior to seeing him in the car apparently clutching something in his sweatshirt pocket.

assume, without deciding, that the motion judge's conclusion was correct.

For the reasons described by the majority, the exit orders directed to, and the patfrisks of, Johnson and Steed were permissible. While Johnson and Steed were out of the vehicle, Douglas came out of the car unbidden. There is evidence that earlier on the evening in question Douglas was "agitated," and that at the time of the stop he was acting unlike his usual "very casual, . . . calm" self. The officer ordered him back into the car, and he complied. But after being ordered back into the car and returning to it, Douglas put the vehicle in gear as if to drive away and said something to the driver. He did so while his fellow passengers were outside the car and a police officer was standing next to it, between it and the jersey barrier.

When, at 3:00 A.M., a passenger in a stopped vehicle who has been in attendance at a gang party and has a violent criminal record including a firearm offense leaves a vehicle unbidden to confront an officer occupied with a lawful patfrisk, it is reasonable for the officer to fear for his safety. And, although the driver kept her foot on the brake, by subsequently shifting the car into gear, Douglas actually manifested a serious threat to officer safety. His attempt to flee -- done in the knowledge he was well-known to the officers, and so

likely would later be found, and that his friends were outside the vehicle and would be left behind -- made it reasonable to suspect that there was something in the car or on his person Douglas did not wish the police to see, most likely a firearm, since he had been convicted previously of a firearms offense, and was recently socializing with gang members.

With reasonable suspicion that Douglas had a weapon either on his person or in the car, an exit order and a patfrisk extending into the interior of the car were justified.  A patfrisk of Douglas's person that revealed no weapon could not -- and therefore did not -- dispel the officer's reasonable suspicion that Douglas was armed and dangerous.  A protective search of the interior of the car, limited to the area from which Douglas might have gained possession of a weapon upon his return to the car, was justified notwithstanding the negative result of the patfrisk of his person.  The gun was found under his seat, in that area.

For these reasons, while I agree with both the majority's method of analysis and its result, I concur only in the judgment of reversal.